## Joy Morton v. Bruce B. Barney et al.

## Gen. No. 13,819.

1. CONTRACTS—*what does not constitute employment of real estate broker.* *Held,* that the evidence in this case did not show the employment of the brokers by the owner and that such brokers were not entitled to compensation.

2. BROKERS AND FACTORS—*what essential to recover compensation.* In order that a real estate broker may recover commissions he must show a contract of employment and an effectuation of a sale upon the terms proposed by the owner.

3. BROKERS AND FACTORS—*when not entitled to compensation.* A real estate broker employed to make a sale or lease is not entitled to compensation where he was not the efficient cause in the effectuation of the transaction for which recovery of compensation is sought.

Assumpsit. Appeal from the Circuit Court of Cook county; the Hon. JOHN GIBBONS, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1907. Reversed. Opinion filed March 20, 1908.

**Statement by the Court.** This is an appeal from a judgment of the Circuit Court awarding appellees a commission of $3,950 as brokers for alleged services in procuring a tenant on a nineteen-year lease of property in Chicago.

Material facts are that in June, 1901, appellant, one Rockwell King, since deceased, and the Western Storage Company, in which said first named parties were interested, purchased at a partition sale the north half of what is known as the Dock Strip, being Block N in the original Town of Chicago, on the west bank of the Chicago River between West Lake and West Randolph streets. At this sale the real estate firm of Dunlap Smith & Co. represented the purchasers, and the property was immediately afterward placed by the new owners in the hands of said real estate agents for sale. Failing either to sell or lease the property, an arrangement was made through Dunlap Smith & Co.

by which appellant purchased from one Butler the. South half of the dock strip and sold to third parties another portion of the original purchase, thus becoming owner of the entire dock strip, subject to the interest of said King and the Storage Company. Finding no sale for the land, which for practical purposes was vacant, appellant decided to erect a new building thereon, provided a tenant could be found who would lease the premises upon satisfactory terms, when so improved. Negotiations were undertaken through the same real estate agents with Kelley, Maus & Company, to whom finally, December 12, 1901, after somewhat lengthy negotiations a formal written proposition was submitted by said real estate agents, Dunlap Smith & Co. acting for appellant. Some time in January or February following an understanding seems to have been reached between appellant and Kelley, Maus & Co., but the latter insisted that as a condition of making any contract, a driveway must be constructed from Lake to Randolph streets which would extend out over West Water street. To do this an ordinance from the city council was necessary and said real estate firm of Dunlap Smith & Co. undertook the task of obtaining such ordinance, which was finally accomplished. Thereafter plans for a building were agreed upon and in October, 1902, Kelley, Maus & Co. executed a contract binding themselves to take a nineteen-year lease of the premises when the building should be constructed. Thereupon appellant paid commisions to said real estate firm of Dunlap Smith & Co. apparently as agreed upon. The active representative of the real estate firm of Dunlap Smith & Co. was one Bauman, who conducted the negotiations with Kelley, Maus & Co. which resulted as above stated. It appears that he first approached Kelley, Maus & Co. on the subject in May, and again in August, 1901.

In July, 1901, appellee Barney, a real estate broker, hearing that Kelley, Maus & Co. were in the market for a new location, called at their office, where he is

Morton v. Barney.

said to have discussed their requirements and agreed to hunt up a location. With his associates, the other appellees herein, he began looking up such location. In August following he was returning from the west side of Chicago in company with Maus, the party having been engaged in looking over certain properties on the west side, when Maus stopped on the Lake street bridge and pointing to the dock strip said in substance that would be a good location for his company, that his firm had missed it in not getting that property before it passed into other hands. This suggestion was enough to put appellee Barney on inquiry, and he offered to investigate. He called on Butler, then the owner of the south half of the dock strip, which appellant afterward bought of Butler before the lease in controversy was executed. Barney called also on Rockwell King, then interested with appellant in the north half of said dock strip. Having seen Butler and King—the latter since deceased—appellee Barney offered to Kelley, Maus & Co. the entire dock strip for sale or ninety-nine year lease, the south half on the part of Butler and the north half on the part of King. His proposition to Kelley, Maus & Co. was embodied in a letter to them dated August 16, 1901, the material part of which is as follows:

"In confirmation of verbal offering I write to say that I am authorized by Mr. Rockwell King, owner of the N. ½ of said property, consisting of lots 1, 2 and the N. ½ of 3, to sell you the same, together with improvements thereon, for $158,000 or to lease you the same for ninety-nine years at an annual rental of 4½ per cent. on a valuation of $160,000 and taxes.

I am authorized by Mr. E. B. Butler, owner of the south half of said tract, consisting of the South half of Lot 3 and all of 4 and 5, to sell you the same for $150,000 or to lease you the same for ninety-nine years at an annual rental of 4½ per cent. on a valuation of $150,000 and taxes.

In case you desire to purchase the property after having taken a ninety-nine year lease, both owners agree

to give you the preferance of purchase over any other purchaser.''

Shortly afterward, upon August 27, 1901, appellee Barney wrote to King as follows:

"(Letterhead of Bruce B. Barney.)

CHICAGO, August, 27, 1901.

MR. ROCKWELL KING,
    39 N. State street.

DEAR SIR:—

I beg to advise you that Kelley, Maus & Co. are favorably considering your proposition on the dock property Lots 1, 2 and the N. ½ of 3, which I submitted to them. I made them two propositions, namely, to sell the property for $158,000 or lease to them for ninety-nine years at an annual rental of 4½ per cent. on a valuation of $160,000, and taxes.

Kelley, Maus & Co. are in negotiations now seeking to dispose of their present building, and will soon be ready to act upon your proposition.

Yours truly,
BRUCE B. BARNEY.''

To this letter no answer was returned. Subsequently appellee Barney submitted a number of pieces of property to Kelley, Maus & Co. for their consideration and he appears to have been engaged in continuous efforts to find something satisfactory to them. He states that he wore a path between his office and theirs. It appears that Barney never saw Rockwell King again about the matter and never had but the one interview with him. He never had any communication with appellant Morton concerning the property in controversy.

The following correspondence between King and appellees was introduced in evidence:

"JANUARY 25, 1902.

ROCKWELL KING, ESQ.,
    39 North State street.

DEAR SIR:—

By the reports of the press and other sources of information we learn that Kelley, Maus & Company are

negotiating directly for a lease of your dock property, which was submitted to them by us with authority from yourself and Mr. Morton concurring. Should the deal be closed, we beg to remind you of the fact that Kelley, Maus & Company are our customers.

Yours truly,
BRUCE B. BARNEY,
WALTER MILLS
of S. B. MILLS & Co.''

''JANUARY, 27, 1902.

DEAR SIR:—

Replying to yours of January 25th, signed by yourself and others, I beg to say that when you have lived a few years longer, you will not be disturbed with regard to your commissions by reports of the press, as you seem to be to-day.

If I remember correctly, I gave Mr. Barney a price at which he would sell certain property on the West side, which we own. If you have any further commission from me, I shall be pleased to be advised of it immediately.

Yours truly,
ROCKWELL KING.''

''FEBRUARY 1, 1902.

MR. ROCKWELL KING,
39 North State Street, City.

DEAR SIR:—

We beg to acknowledge receipt of your favor of the 27th ult. In reply thereto allow us to call your attention to the letter written by us to Messrs. Kelley, Maus & Company of date August 16, 1901, a copy of which is enclosed herein. We desire also to call your attention to our letter to you of August 27th, 1901, informing you of the fact that we had submitted the property in question to Kelley, Maus & Company, either for purchase or lease. In view, therefore, of these negotiations and our understanding with you, we again wish to call your attention to the fact that Kelley, Maus & Co. are our customers.

Yours truly,
BRUCE B. BARNEY,
S. B. MILLS & Co.''

The jury returned a verdict in favor of appellees awarding 2½ per cent. upon the value of the land as stated in the contract with Kelley, Maus & Co. of October, 1902. Upon motion for a new trial the court was of the opinon that in no event could appellees be entitled to commissions on the south half of the dock strip which at the time Barney offered it to Kelley, Maus & Co. was owned by Butler, and judgment was entered for 2½ per cent. on $158,000, the price for which appellee Barney offered to sell the north half of the dock strip in August, 1901. From this judgment the appeal is prosecuted.

RUNNELLS, BURRY & JOHNSTONE, for appellant; WILLIAM BURRY and F. B. JOHNSTONE, of counsel.

CHARLES C. GILBERT and WILLIAM H. BARNUM, for appellees.

MR. JUSTICE FREEMAN delivered the opinion of the court.

It is urged in behalf of appellant that appellees failed to prove their employment as brokers; that in any event the judgment is erroneous because based not on the value of the north half of the dock strip, but on the price for which appellee Barney offered it to Kelley, Maus & Co.; that appellees were not the procuring cause of the lease to Kelley, Maus & Co.; that said lease was made by appellant through his own real estate agents, Dunlap Smith & Co., and not through appellees or any of them, and that certain instructions were erroneous.

As to the first of these contentions, that appellees failed to prove any employment as brokers by appellant or by Rockwell King in his lifetime, the only evidence relating to such employment is, first the fact that appellee Barney called on King and that thereafter, August 16, 1901, he submitted to Kelley, Maus & Co. an offer which he stated he was authorized by King

to make, viz., to sell to said Kelley, Maus & Co. the north half of the dock strip which appellant and King then owned, for $158,000, or to lease the same for ninety-nine years at a stated annual rental; second, the fact that Barney wrote King August 27, 1901, that he had submitted said propositions to Kelley, Maus & Co., to which letter no reply was made; third, that January 25, 1902, Barney wrote King that he learned Kelley, Maus & Co. were "negotiating direct for a lease of your dock property" and stating that Kelley, Maus & Co. were appellees' customers; fourth, a letter from King to Barney in which King states that he gave Barney "a price at which we would sell certain property on the west side which we own" and added "If you have any further commission from me I shall be pleased to be advised of it immediately;" fifth, appellees' reply to that letter in which he calls attention to his own letter of August 16, 1901, to Kelley Maus & Co., a copy of which he enclosed, and to his letter of August 27, 1901, to King "informing you of the fact that we had submitted the property in question to Kelley, Maus, either for purchase or lease." It is apparent, we think, that this evidence fails to present any actual proof that King ever employed appellees or either of them as his broker. He himself in his lifetime denied over his own signature that he did more than to give "Mr. Barney a price at which we would sell," and tells Barney that if he has "any further commission from me I shall be pleased to be advised of it immediately." He made such denial as soon as he had any intimation that appellees were inclined to claim that he might owe them a commission. In Barney's reply to King's request he does not claim to have been employed by King. He merely encloses a copy of his own letter to Kelley, Maus & Co. and calls attention to his own letter to King of August 27, 1901, in which he states that he made two propositions to Kelley, Maus & Co which the latter were favorably considering. Barney's own letters could

furnish no evidence against King, and if they could do so they contain no suggestion that King had ever employed him in any capacity whatever. Nor does King's letter furnish any such evidence. In Rees v. Spruance, 45 Ill. 308-311, it was said that where an owner told a broker he might have all he could get for the property over a certain sum, it did not amount to an employment of the services of the broker. The court says: "We cannot hold that a mere proposition of this sort made upon the street in reply to a question asked by a broker about the price of a certain property understood to be for sale, amounts to an employment of the broker so as to entitle him to commissions on whatever price the property might bring. The defendant, it is true, found a purchaser through information furnished by the broker and would seem to be under a moral obligation to give him a reasonable compensation for the services thus rendered; but as he had never employed him the obligation is of that imperfect character which the law cannot enforce." In the case at bar not only is there no evidence of employment of appellees, no sufficient evidence of any moral obligation even, but the letter of King expressly repudiates any employment of Barney. There is no warrant for the claim that where a broker goes to an owner asking and receiving the price of a piece of property he thereby becomes the agent of the owner entitled to commissions, if the owner subsequently disposes of the property. Nor can a broker by letters of his own addressed to a possible purchaser or by writing an owner that he has offered the property to such proposed purchaser make a contract of employment for himself entitling him to commissions. It takes two to make a contract of that kind, and an owner is under no obligation to respond to every letter he may receive from a real estate broker whom he has not employed. King, so far as the evidence tends to show, would have been under no obligation to sell or lease the property to Kelley, Maus & Co. had they chosen to accept the proposition

submitted to them by Barney in his letter of August 16, 1901. The lease finally consummated between appellant and Kelley, Maus & Co. was in no respect the proposition made by appellees nor like it. It was neither a sale nor a ninety-nine year lease of vacant property. The terms and the whole situation were entirely different. What was actually done by appellant was to lease for a term of nineteen years the land appellant owned when appellee Barney inquired the price, together with other land subsequently acquired, appellant having meanwhile erected at his own expense, a large building on such land. In this transaction appellees had no part and apparently do not claim to have had.

Appellant urges that appellees were not the procuring cause of the lease made with Kelley, Maus & Co., and, as above indicated, the contention is, we think, clearly sustained by the evidence. There is evidence tending to show that in May, 1901, appellant's real estate agents, Dunlap Smith & Co., before appellee Barney called on Rockwell King, had spoken to Maus with reference to changing their location. In June, 1901, and again in August of the same year, the same agents appear to have offered the dock property to Kelley, Maus & Co. It was on the 16th of August, 1901, that appellee Barney wrote Kelley, Maus & Co., claiming to be authorized to sell or lease them the same property. It is undisputed, however, that the transaction as finally consummated was carried through by the same real estate brokers, Dunlap Smith & Co., originally employed by appellant and King in the purchase of part of the property leased, subsequently employed in the purchase of the rest of it and in the sale of some of the land originally purchased at the partition sale, employed in the entire course of negotiation with Kelley, Maus & Co., and employed in procuring the ordinance for a driveway which made the property available to Kelley, Maus & Co., and seems to have removed the last obstacle to the lease as finally agreed upon.

It is said in Whitcomb v. Bacon, 170 Mass. 479, 482: "Where several brokers have each endeavored to bring about a sale which finally is consummated, it may happen that each has contributed something without which the result would not have been reached; one may have found the customer who otherwise would not have been found, and yet the customer may refuse to conclude the bargain through his agency; and another broker may succeed where the first has failed. In such a case, in the absence of any express contract, that one only is entitled to a commission who can show that his services were the really effective means of bringing about the sale; or * * * the predominating efficient cause." As was said in Sibbald v. Bethlehem Co., 83 N. Y. 378, 383: "A broker is never entitled to commissions for unsuccessful efforts." It is not pretended in the case at bar that appellees made more than an unsuccessful effort to sell or lease a part of the property. In Wilson v. Mason, 158 Ill. 304, 309, the court says: "The duty of a broker who is employed to sell real estate is to find and produce to the vendor a purchaser who is ready, willing and able to complete the purchase proposed. This he must do before he is entitled to commissions;" and the purchaser must be "willing, ready and able to perform the contract according to the proposed terms." It cannot be contended in the case at bar, in view of the evidence, that Kelley, Maus & Co. were ever willing to buy or lease the premises offered to them by appellees in August, 1901, according to the terms which appellee proposed. There is no evidence, so far as we discover, tending to show that the nineteen-year lease as finally consummated was made through the instrumentality of appellees, through means by them employed, or through information derived from them. It is evident that appellees themselves had in view an entirely different transaction from that ultimately effected with Kelley, Maus & Co. for which they are now claiming to be entitled to commissions. If we assume for the sake of

the argument that appellees were authorized by King to make the proposition stated in their letter of August 16, 1901, nevertheless, as said in Close v. Browne, 230 Ill. 228, 241, "it cannot be presumed that the parties intend that the contract shall apply to a transaction wholly different from the one which they have in view when they enter into the contract." See, also, Vreeland v. Vetterlein, 33 N. J. Law, 247; Davis v. Gassette, 30 Ill. App. 41, 45; McGuire v. Carlson, 61 Ill. App. 295, 300.

It is singular if appellees or either of them regarded themselves as employed to represent appellant and King they should have failed to go to them afterward in such capacity and to make further efforts to consummate some kind of a deal between such alleged employers and Kelley, Maus & Co. They appear to have submitted a number of other pieces of property to Kelley, Maus & Co., but seem to have abandoned any effort to induce Kelley, Maus & Co. either to purchase or lease the property in question after the failure of the first and only effort made by Barney. It is clear, we think, from the uncontroverted evidence that appellees fail to prove any contract of employment by appellant or King, that the lease as finally entered into was not procured by or through their instrumentality, that if we could assume the existence of an express or implied contract of employment of appellees as brokers, they yet failed to effect either a sale or lease on the terms they proposed, and no such sale or lease has been effected since.

Other errors are assigned and argued in the briefs, but in view of the conclusions stated, we deem it unnecessary to consider them.

The judgment of the Circuit Court must be reversed, with a finding of facts.

*Reversed, with finding of facts.*