STEVENS ET AL. v. BRIMMER ET AL.*
(No. 1268; December 7, 1926; 251 Pac. 1.)

PLEADING—BROKERS—AGREEMENT OF EMPLOYMENT—RECOVERY OF COMMISSION—BROKER NOT EMPLOYED NOT ENTITLED TO COMMISSION.

1. In determining sufficiency of petition in action brought for commission for sale of oil leases, based on letters attached to petition as exhibits, allegations of petition must be construed *in connection* with such letters.

2. In suit for commissions for sale of oil lease, where only basis of employment was defendants' letter, indicating indisposition to sell, but stating that they would probably be inclined to dispose of property for fair offer, but at not less than a named rate net, and requesting further correspondence from plaintiffs, if interested, petition *held* not to state cause of action.

3. Where broker had not been employed to sell defendants' property, he could not, by securing a purchaser, notifying defendants of that fact, and requesting protection on his commission, render defendants liable to him for commission on sale made direct to such customer.

*See Headnotes: (1) 31 Cyc. p. 561 n. 8. (2) 9 CJ p. 554 n. 92; p. 555 n. 93; p. 556 n. 96, 97, 98, 99; p. 557 n. 1, 2, 3, 4; p. 558 n. 5; p. 635 n. 41; p. 636 n. 43. (3) 9 CJ p. 554 n. 92; p. 555 n. 93; p. 557 n. 3; p. 558 n. 5.

Error to District Court, Laramie County; W. A. Riner, Judge.

Action by William E. Stevens and another against George E. Brimmer and others. A demurrer to the complaint was sustained, and plaintiffs bring error.

*Ray E. Lee,* for plaintiffs in error.

The petition stated a cause of action for recovery of broker's commission; Frost v. Houx, 15 Wyo. 353; Evans v. Co., 21 Wyo. 183; Meechem on Agency, 2nd Ed. Sec. 2435. The lease was a chattel real; Brown v. Beecher, 120 Pa. St. 590; Grasiosa Co. v. County, (Calif.) 99 Pac. 483; Tupeker v. Deaner, (Okla.) 148 Pac. 853; Thompson on Real Property, Vol. 1, Sec. 62; Barnes v. Bee, 138 Fed. 476; Barnsdall v. Owen, 215 Fed. 519; Oil Co. v. Belleview Co., 119 Pac. 260. The lease should be considered as personal estate; Tiffany on Real Property, 2d Ed. p. 8; Priddy v. Thompson, 204 Fed. 955, and cases cited. Plaintiffs were not selling real estate within the meaning of the real estate dealers' license law, Chapter 31, Laws 1921, and plaintiffs were entitled to maintain their action without reference to the question of a license; Springsteen v. Lewis, 259 Fed. 518; Meechem on Agency, 2d Ed. p. 2091; Howard v. Lebby, 30 A. L. R. 830. The above authorities hold that a single transaction in selling real estate does not constitute one a real estate agent.

*Clarence A. Brimmer,* for defendants in error.

The petition fails to show the employment of plaintiffs as agents; Chapter 31, Laws 1921, requires real estate agents to be licensed, but the petition does not show that plaintiffs were licensed real estate agents; allegations, as to the legal effect of the alleged contract, are superfluous; 4 Enc. Pl. & Prac. 918. No contract was alleged or proven; Page on Contracts, Vol. 1, Sec. 78; 4 R. C. L. 43, p. 298, 299; 9 C. J. 516; Johnson v. Whalen, (Okla.) 74 Pac. 503; Geier v. Howells, (Colo.) 107 Pac. 255. The Wyoming

cases cited by plaintiff in error are based on different facts from the case at bar; an unlicensed broker cannot recover commission; 9 C. J. 565; Meyer v. Wiest, (Pa.) 95 Atl. 715; Kennedy v. Lonabaugh, 19 Wyo. 352; Williston on Contracts, §§ 1763-1764. Real estate agents are persons employed to sell, exchange, lease or offer to lease any real estate or improvements thereon as a vocation; Laws 1921, Chapter 31. An oil or gas lease is an interest in real estate; Barnsdall v. Gas Co., 74 Atl. 207; Hicks v. Gas Co., (Pa.) 57 Atl. 55; Chandler v. Hart, (Calif.) 119 Pac. 516; Allen v. Co., (Calif.) 168 Pac. 884; Kolachney v. Galbreath, 26 Okla. 772; Rich v. Doneghey, (Okla.) 177 Pac. 87; Shaffer v. Marks, 241 Fed. 139; Aggers v. Shaffer, 256 Fed. 648; Guffey v. Smith, 237 U. S. 101. An oil and gas lease is within the statute of frauds; Montana etc. Oil Co. v. Gibson, 19 Wyo. 1; and in the case of Jones v. Losekamp, 19 Wyo. 83, the decision indicates that the Supreme Court believes that such instruments vest an interest in land; the petition failed to show an employment, or that plaintiffs were licensed dealers, and the judgment of the lower court should be affirmed.

POTTER, Chief Justice.

The judgment complained of in this case was rendered in favor of the defendants below for costs and dismissed the action, following an order sustaining a demurrer to each of the two causes of action alleged in the petition and the failure of the plaintiffs thereafter to amend as allowed by such order. The action was brought for the recovery of a commission alleged to be due to the plaintiffs for their services as brokers for the sale of certain oil and gas leases granted by the United States to the defendants. upon lands described in the petition and alleged to be situated in what is known as the Maverick Springs Oil District in this state.

Error is assigned only upon the order sustaining the demurrer, and the ultimate question, therefore, is whether

or not the court erred in that ruling. At the time of the filing and hearing of the demurrer, each cause of action of the petition had been amended pursuant to an order requiring it to be made more definite and certain by inserting therein, in addition to the other allegations thereof, certain correspondence between the parties relied upon to show a contract of employment, together with an express averment that each cause of action was based upon such correspondence. So that the several averments of the petition as to each cause of action are to be construed in connection with the letters inserted therein and attached thereto, comprising said correspondence.

The difference, if any, between the averments of the two causes of action, in substantial effect, is little; and yet there is perhaps enough to require that the averments of each be separately stated. It was originally averred in the first cause of action that in April, 1921, the defendants were the owners of oil and gas leases granted by the United States covering certain described lands situated in the above mentioned oil district; that the plaintiff Bowman had been informed during that month that the Union Oil Company of California desired to purchase said leases, and that thereupon he entered into correspondence with defendant Brimmer with reference thereto, notifying him that said plaintiff would accept a reasonable commission for his services in case he and his associates, the other defendants, sold the leases or any portion thereof to the said Union Oil Company. That thereafter said Brimmer "priced 1140 acres of said land to said plaintiff Bowman at $1000 per acre for the leases thereof, and said plaintiff Bowman thereupon transmitted said information to the other plaintiff, Stevens, who was associated with plaintiff Bowman in transacting said business, and said plaintiff Stevens thereupon submitted said offer to said Union Oil Company." That thereafter said Oil Company "entered into negotiations with said defendants, who were acting

by and through said defendant Brimmer and on or about June 20, 1921, said defendants sold and assigned the leases of all of said lands to said Oil Company and that thereafter * * * the assignment and transfer of the leases * * * was accepted and approved by the Secretary of the Interior." That plaintiffs are informed and believe and therefore allege that defendants received as consideration for said sale and transfer the sum of $1000 per acre for all of said leases, or a total sum of $2,400,000. "That said defendants agreed to pay said plaintiffs a reasonable compensation for their services in securing a purchaser for said oil and gas leases;" and "that a reasonable compensation for said services is ten percent * * * or a total sum of $240,000." That said sum became due and payable to plaintiffs upon the consummation of said sale and the approval of the Secretary of the Interior, and that the same is due and owing to plaintiffs with legal interest, and that defendants and each of them have failed, neglected and refused to pay said sum or any part thereof. It is also alleged in that cause of action that the defendant Brimmer acted for and on behalf of himself and each of the other defendants, that said leases are all in his name, and that the assignments thereof were made by him.

The original averments of the second cause of action may be briefly stated as follows: That during the month of July, 1921, the defendants were the owners of government oil and gas leases on certain described lands (the same as described in the first cause of action) ; that said leases were sold in the name of the defendant Brimmer, who held the same for the use of himself and the other defendants; that during said month of April, the plaintiffs, at the special instance and request of the defendant Brimmer, then acting for himself and the other defendants, procured a purchaser for said leases; that in so doing the plaintiffs rendered services to the defendants of the

reasonable value of $240,000; that said defendants promised and agreed to pay the reasonable value of said services, but that they have wholly failed, neglected and refused to pay the same or any part thereof; that the sale of said leases was consummated on July 9, 1921, by the approval thereof by the Department of the Interior of the United States; and that thereupon the defendants became and ever since have been indebted to the plaintiffs in said sum with legal interest from and after said date.

The letters comprising the correspondence aforesaid and which became a part of the petition in connection with the averment that each cause of action was based thereon, seem to be of such importance that they will be . quoted as now found set forth as part of the pleading:

"EXHIBIT A.

Lander, Wyoming,
Apr. 5th, 1921.

Mr. George E. Brimmer,
Rawlins, Wyoming.
Dear Sir:—

I have recently had inquiries from some very substantial Oil Cos. for an oil property of some considerable size located in this State. I have talked to Mr. Barber about the Maverick Spgs. Property, which you are interested in, and while he has furnished me some information, he is frank to admit that he hasnt the details and advises me to write to you for information as you have the handling and sale of this property in charge.

I do not care to have you go into detail as to title, production, etc, as I have run that down pretty close from here, but I would like to have you state what I could expect in the way of a commission or compensation should I be able to find you a buyer that would take this property over.

You might indicate what I should ask for this property, however, I do not regard that part of it so important at this time if I can convince the buyer that we have what he is looking for.

I hope I may hear from you at your earliest convenience.

Yours very respectfully,    ·

B. F. Bowman.

### EXHIBIT B
### BROWN PALACE HOTEL,

Denver, Colo.

Apr. 15th, 1921.

Mr. B. F. Bowman,

Lander, Wyo.

Dear Sir:

I am in receipt of your letter of Apr. 5th, in regard to the Maverick Springs Property. As you undoubtedly know, we have a lease direct from the Government upon this property so that no question of title is involved.

We had not anticipated that it would be advisable to place this property in the hands of an agent for sale, but had contemplated the drilling under our own direction.

Of course, if we received a fair offer, we would probably be inclined to dispose of the property. I do not anticipate that any offer would be considered unless it meant $1,000 per acre net to the owner for the 1140 acres of proven territory and a reasonable compensation for the balance of the land included in the lease. If you are interested in this matter at these figures, I would be pleased to hear from you.

Very truly yours,

Geo. E. Brimmer.

EXHIBIT C.

Lander, Wyo,
Apr. 22nd, 1921.

Mr. Geo. E. Brimmer,
Rawlins, Wyo.
Dear Sir:

I am in receipt of your letter of the 15th, inst. relative to your Maverick Springs Property, and have submitted same through San Francisco people to Mr. C. H. Sherman of Manvill, Wyo. Supt. of the Union Oil Co.

The Union Oil Co. of California are very capable people and am sure merit consideration should they make inquiry.

Kindly protect me in a reasonable commission on any business you may close with these people on this property.

Very truly yours,
B. F. Bowman.''

While it is contended in the brief for plaintiffs in error, but without argument, that the alleged facts are sufficient to entitle the plaintiffs generally to a commission as real estate brokers, the questions principally discussed in that brief relate to the effect of the failure to allege in the petition that the plaintiffs are licensed real estate brokers, agents or salesmen under the provisions of an act providing for licensing and regulating the business or vocation of a real estate agent and salesman. (Ch. 31, Laws 1921). But for reasons presently to be more fully explained, we think the questions said to arise under said statute need not and should not be decided in this case.

It seems proper, however, to state the questions thus discussed to the end that what we decline to decide and our reasons therefor may be clearly understood. The statute aforesaid declares, in the first section, that it shall be unlawful to engage in the general business or vocation of a real estate agent, or real estate salesman, without first obtaining a license therefor and giving a bond as pro-

vided in said section. And in the second and third sections further provisions are made regulating the application for and issuing of such licenses. By section 4 it is provided that a real estate agent "within the meaning of" the act "is a person, firm or corporation who, for a compensation or a valuable consideration, directly or indirectly, sells or offers for sale, buys or offers to buy, or negotiates the purchase or sale, or exchange, of real estate, * * * for others as a vocation." A real estate salesman within the meaning of the act is defined in that section also as a person who for a compensation or valuable consideration is employed by a licensed real estate agent, to sell, or offer for sale, or to buy or offer to buy, or to negotiate the purchase or sale or exchange of real estate as a vocation. That section contains some exceptions which need not be here stated. There is a provision in section 5 that "one act for a compensation or valuable consideration of buying or selling real estate of or for another, or offering for another to buy or sell or exchange real estate * * * shall constitute the person, firm, copartnership or corporation performing, offering or attempting to perform" any of the acts enumerated, "a real estate broker or real estate salesman within the meaning of this act." And it is provided in section 6 that each person, firm or corporation licensed under the provisions of the act shall be required to have and maintain a definite place of business in the state, which shall serve as his office for the transaction of business. It is provided in section 10 that "no person, firm or corporation engaged in the business of a real estate agent or salesman shall bring or maintain any action in the courts of this state for the collection of compensation for the negotiation of a purchase, sale, exchange, lease or rental of real estate, improvements or any interest therein, without alleging and proving that he was a duly licensed real estate agent,

salesman or attorney at law at the time the alleged cause of action arose.''

At least two questions are discussed in the brief aforesaid under that statute. (1) Whether the sale of an oil and gas lease issued by the United States on Indian lands constitutes a sale of real estate or an interest therein within the meaning of the statute. (2) Whether the provision that one act for compensation shall constitute the person so acting a real estate broker or salesman is valid, or to be construed strictly as so providing in view of the definition of a real estate agent in section 4. The first of these questions is discussed in the brief from the standpoint of decisions said to hold that a particular oil or gas lease involved in the case did not convey an interest in land but a chattel interest merely, or, as quoted from one or more of the cases cited, that ''the lease was a chattel real, but none the less a chattel,'' citing, among others, Brown v. Beecher, 120 Pa. St. 590, 15 Atl. 608, and Tupeker v. Deaner, 46 Okl. 328, 148 Pac. 853. Or, upon quotations from text-books describing, to some extent, the nature of what is meant by the reference to an oil or gas lease. Thus, Thompson on Real Property, Vol. 1, Sec. 62, is cited in the brief, from which we quote the following:

''Thus it would seem that, in the absence of a statute to the contrary, the grant of an exclusive privilege to go upon land for the purpose of exploring for oil or gas, the grantor to receive part of the oil or gas mined, does not vest in the grantee any estate in the land or oil or gas, but is merely a license or grant; such a lease creating an incorporeal hereditament, and the lessees have no right or title to the oil or gas lying under the surface of the land.''

But the petition in this case, in either cause of action, contains no description whatever of the terms, provisions or conditions of the instrument or instruments referred to, and, as suggested in the brief for defendants in error, the

leases alleged to have been owned and sold by defendants
are not, therefore, before the court for construction or de-
termination as to whether they do or do not grant or con-
vey or transfer an interest in the land.

And certainly, there is nothing in the petition to dis-
close or inform the court whether the particular transac-
tion for which compensation is sought was or was not the
only act performed by the plaintiffs or either of them that
might be assumed or held to be a transaction of sale of
real estate. But for a broader and very clear reason,
aside from those questions, we think they are not neces-
sary to be considered in disposing of this case.

In contending, aside from any question that might arise
under the said licensing statute, that the alleged facts
show a right to the compensation sued for, counsel for
plaintiffs in error assume that they have specifically al-
leged the rendition of services for defendants at their in-
stance and request and upon their promise to pay for the
same; that the amount sued for is the reasonable value of
said services; that the defendants sold the property to a
customer procured by the plaintiffs, and that the commis-
sion is due and unpaid. And this, they say, states a cause
of action under rules so well established, that further dis-
cussion is unnecessary. But the assumption that the peti-
tion alleges such ultimate facts disregards the correspond-
ence between the parties made a part of the petition as
required by the order of the court below and alleged by
the amendment to be the letters upon which the causes
of action are based. And, as already indicated, the sev-
eral general or specific allegations of the petition as orig-
inally drawn and filed, alleging an employment or a con-
tract of employment, must be read, construed and consid-
ered in connection with and as controlled by those letters.
When so read and considered, the petition does not, in
our opinion, state a cause of action, irrespective of the

statute aforesaid for the licensing of real estate brokers or salesmen or any question arising thereunder.

The difficulty in maintaining or sustaining the action upon the averments of the petition read in connection with the letters aforesaid arises principally from the failure thereby to show a contract of employment either express or implied; and that is necessary to entitle a real estate broker to compensation, unless, it may be, there should be a showing of ratification sufficient to overcome the absence of an original contract of employment. An express contract of employment seems to be relied upon in this case, as we understand the averments of the petition. But we have considered the matter as well in the light of the rules governing implied contracts; though, if there was no express contract there would seem to be little if anything in the petition from which a contract might be implied.

The general or fundamental rule of the necessity for an appointment or contract of employment is stated as follows in Mechem on Agency, 2nd Edition, Sec. 2390:

"The broker, like other agents, derives his authority from the appointment of his principal, and in order to obtain rights himself, or establish liability to others against his principal, or to incur liability to his principal, the fact of his appointment must be made to appear. No special method is requisite, however, except where a statute prescribes it, but, as in the case of other agents, the appointment may be made by an instrument in writing, or by mere spoken words, or it may be presumed from the conduct of the parties. * * * The principal cannot be bound by, or be made liable for, services rendered by a broker which are purely voluntary on the part of the latter and performed without the express or implied consent of the principal; but even in such cases the principal may, by availing himself of the benefits of the services,

not only ratify and confirm the acts done, but render himself liable to the broker for their value.''

And in Sec. 2426 of the same work, it is said:

''To entitle the broker to commissions for his services, he must make it appear that the services were rendered under an employment and retainer by the principal, or that the latter accepted his agency and adopted his acts, under circumstances reasonably indicating that the principal knew that the services had been rendered on his account and in reliance upon his obligation to pay for them. If the broker rendered the services as a mere volunteer, without any employment, express or implied, he cannot recover commissions, even though he brought the parties together and was the efficient means of procuring the consummation of the bargain. He must also show that he was employed by the party from whom he seeks to recover. If he was really acting as agent for the seller, he cannot recover from the buyer, (except in the cases in which such a double agency is permissible, and was assented to by both parties); and the same is equally true where the position of the parties is reversed.''

The rule is stated in Corpus Juris, Volume 9, 554-558, as follows:

''To entitle a broker to compensation, he must have been employed to negotiate the transaction in connection with which his services were rendered. In the absence of such employment, or, in other words, where the broker acts as a mere volunteer, he is not entitled to compensation, although his services are the efficient cause of bringing the parties together and result in a sale or other contract between them. * * * The contract of employment entered into by a principal and a broker may be an express contract, containing the elements of offer and ac-

ceptance, and based on a sufficient consideration. The employment and consequent agreement to pay commissions may also be implied from the circumstances; as where the principal accepts the benefits of the broker's services with the knowledge that he expects to be paid therefor, or where he places property in the hands of the broker for sale, and a sale is made through the efforts of the broker. But a contract of employment and an agreement to pay commissions will not be implied from the mere fact that the owner of property consents to the rendition of services by a broker which result in a sale of the property, especially where the owner had no knowledge that the broker was acting as such before the sale was consummated, or where he had previously refused to employ the broker.''

The rules which appear to us to be most applicable in this case are stated also in Ruling Case Law, quoting from Volume 4, pages 298-299:

''As it takes two to make a bargain, a broker is not entitled to be compensated for his services unless they were rendered pursuant to the express or implied request of his employer. To warrant a recovery upon his part he must have been actually employed by the person who he is seeking to hold liable, for otherwise there would be no legal basis for his claim to compensation notwithstanding the fact that a purchaser may have been found through information furnished by him. The calling of a broker is not preferred in the eye of the law to that of other occupations, and he is no more entitled to remuneration for services voluntarily rendered without any employment, express or implied, than any other member of the community. While a contract of employment may be implied from subsequent acts of ratification on the part of the alleged principal, to warrant the inference of a previous request, the owner must say or do something tending to

prove that he accepted the broker as his agent in the matter—something more than merely selling to the party whom the broker, while acting as a volunteer, brought to him.  *  *  *  Nor can a broker, by letters of his own, addressed to a possible purchaser, or by writing to an owner that he has offered the property to such proposed purchaser, make a contract of employment for himself entitling him to commissions.  It takes two to make a contract of that kind, and an owner is under no obligation to respond to every letter he may receive from a real estate broker whom he has not employed.  Furthermore, it is practically universally held that the mere asking and receiving the price on property does not of itself make the broker the agent of the owner, entitling him to commissions, although he finds a purchaser, or the owner subsequently disposes of the property to one with whom the broker had negotiated.  In like manner, the mere seeking of an introduction to another by a broker is not legally the equivalent of· employing him to sell the property, and where there is nothing more in his favor, that incident will be regarded as voluntary and insufficient to entitle him to a commission.  Obviously, a promise on the part of an alleged principal to pay a broker for services previously rendered without any request, is without consideration and there can be no recovery thereon.''

In a well-considered and what we think may be regarded as a leading case upon the particular question that must be decisive of this case, the frequently cited case of Pierce v. Thomas, 4 E. D. Smith (N. Y.) 354, the court stated the decisive principle of the case as follows:

''To entitle a broker to recover commission for effecting a sale of real estate, it is indispensible that he should show that he was employed by the owner, (or on his behalf,) to make the sale.  A ratification of his act, where original employment is wanting, may, in some circum-

stances, be equivalent to an original retainer, but only where there is a plain intent to ratify. An owner cannot be enticed into a liability for commissions against his will. A mere volunteer, without authority, is not entitled to commissions, merely because he had inquired the price which an owner asks for his property, and has then sent a person to him, who consents to take it. A broker has no better claim to recover for voluntary services, rendered without employment, and not received and acted upon by the owner as rendered in his behalf, than any other volunteer.''

Thereupon, the court disposed of the case by saying:

''But the proofs in this case show a case quite free from doubt; here, not only was no employment to sell proved, but it was shown, without contradiction, that the defendants refused to employ the plaintiffs as their broker, and told him that they would not give him the property to sell, would not permit him to put a bill on it, and would not hire a broker about it in any manner. Notwithstanding that distinct refusal to suffer him to become their agent to sell the property, the plaintiff seeks to recover upon showing that he sent to the defendants a purchaser, and that the defendants had stated to his clerk the price which they asked for the lots. If, upon this proof, an owner is liable, and against his express refusal to employ the plaintiff, then no man is safe in stating to applicants the terms upon which he will sell. It is not true that an owner may not declare his price to whom he will, without the hazard of paying commissions to those who volunteer, unasked, to send him a purchaser on his own terms.''

The apparent theory of each cause of action as stated in the petition in the case at bar is that the plaintiffs procured a purchaser for the property, a service entitling them to a commission, although the actual sale was made

by the defendants.  Or, to state it more particularly, that the plaintiffs brought the property and the named price to the attention of the party to whom it was subsequently sold, thereby producing a purchaser to whom the property was sold through negotiations conducted by defendant Brimmer acting for himself and associates.  But it is very clear from the correspondence between Bowman and Brimmer that there was no previous contract appointing or employing Bowman or the plaintiffs to procure a purchaser for the property or to handle it for the defendants in any way; and therefore nothing upon which to base any claim for commission or compensation for the alleged service of procuring a purchaser to whom the property was subsequently sold.  Nor did the plaintiffs afterwards do anything, so far as the averments of the petition are to be understood as showing, that can properly be held to be benefits subject to acceptance by the defendants that might constitute or be taken as proof of an implied contract of employment, or as entitling the plaintiffs to compensation upon the theory of ratification.  For it is not averred that they conducted the negotiations for or sold the property.

The first letter from Bowman to Brimmer may no doubt he considered as an invitation to list or place the property in his hands for sale at a price to be stated.  But Brimmer did not do that.  What he did, as very clearly disclosed by his letter—the only letter he wrote to Bowman—was the reverse of that.  He stated that they had not anticipated placing the property in the hands of an agent for sale, but had contemplated drilling under their own direction; but that if they received a fair offer, they would ''probably be inclined to dispose of the property,'' though he did not anticipate that any offer would be considered unless it meant $1000 per acre ''net'' to the owner for the 1140 acres of proven territory and a reasonable compensation for the balance of the land included in the lease.  And

concluding with the statement that if he (Bowman) should be interested in the matter at those figures, he (Brimmer) would be pleased to hear from him. Mr. Brimmer thereby clearly declined the invitation to place the property in Bowman's hands for sale, and named a "net" price, as the minimum limit that might be considered if offered the owners, thereby clearly excluding any obligation on their part for a commission. While that possible price was specified as for the stated number of acres of *proven* territory, the remander of the sentence referring to a reasonable compensation for the balance of the land must necessarily be understood as controlled by the words "net to the owner," thus excluding any thought or intention of consenting to an obligation for a commission.

The answer to that letter by the plaintiff Bowman, informing the defendant Brimmer that he had submitted his letter through other people to the superintendent of the Union Oil Company, and closing by saying "kindly protect me in a reasonable commission on any business you may close with these people on this property." might well have been understood, under the circumstances, as a desire for protection in the matter of commission to be received from the purchaser. It did not confer any right to *expect* a commission from defendants in the absence of a previous contract, nor did it necessarily impart any such expectation to defendants sufficient as proof of an implied contract or as a basis therefor. It could not *alone* form the basis of an obligation on the part of Brimmer and associates, upon subsequently negotiating the sale to said oil company, to pay a commission. The one party, as shown by the rules aforesaid, cannot thus limit the owner of property in his dealings with it. The Wisconsin court refers to such conduct as an attempt to place a label of proprietorship upon a prospective purchaser, to prevent, if possible, any dealings with such party by a property

owner without becoming obligated to pay a commission upon the result of his own negotiations. Segnitz v. Grossenbach Co., 158 Wis. 511, 149 N. W. 159. The court said:

"This evidence, fairly weighed, does not tend to establish the existence of any express contract of agency or for a commission between respondent and appellant, but the contrary. * * * It is not claimed that any was thereafter made. In order to raise an implied contract to pay for services several things are necessary which are lacking here. First, the services must have been performed under such circumstances as to give the recipient thereof some reason to think they are not gratuitous, not performed for some other person, but with the expectation of compensation from the recipient. That was not the case here. In fact, as shown, respondent performed the services of transmitting the offers for McCarthy; in appearance they were his own offers; in neither case would there be a suggestion of expectation of compensation from the appellant. Second, in order to raise an implied contract to compensate for them, the services must have been beneficial to the person sought to be made liable. Here the appellant received no benefit whatever from the services of respondent. The latter neither procured a purchaser nor made a sale. He merely intercepted a purchaser on his way to appellant and in effect said to the purchaser, let me bear your message. Respondent, apparently offering for himself, was in fact acting for McCarthy, but he did not so inform the appellant until the time he made claim for commission before the appellant had met McCarthy and while the latter was on his way to see appellant for the purpose of endeavoring to make the purchase he had intended to make before the Segnitz agency met him and requested to be allowed to make his offers for him. The respondent in this conversation plainly attempted to put a sort of tag or brand upon McCarthy so that appellant could not sell to McCarthy without be-

coming liable for respondent's commission.  Never having procured McCarthy as a purchaser this attempt was futile. In selling to McCarthy the appellant did not avail himself of a purchaser procured by respondent nor of any services performed by respondent beneficial to appellant or which when performed the appellant had any reason to believe were performed with the expectation of compensation from appellant.   *   *   *   As before stated, it requires something more than the mere performance of voluntary services to create an implied contract to compensate for such services.''

Among the numerous cases establishing and illustrating the principles which we hold to be controlling of the decision in this case are a few appearing to be so closely in point upon the facts that we shall close with a reference to them without attempting to cite others which we think also clearly support our conclusion.

It is recited in the opinion in the case of Gastner v. Richardson, 18 Colo. 496, 33 Pac. 163, that if the finding of the court had been in plaintiff's favor the appellate court might not have felt at liberty to disturb it, since from the facts and circumstances shown by plaintiff's evidence, a contract of employment might possibly have been involved, but that the testimony of the defendant was plain and positive to the effect that he did not employ the plaintiff as his agent in any capacity; that plaintiff came to his office and inquired what he would take for his Welton Street property; that he told plaintiff the amount he would take "net;" but that he never put any property for sale on commission and never employed any agent; also, that afterwards when plaintiff claimed to be defendant's agent in the transaction, he told the plaintiff that "he was no such thing." The court said that according to defendant's evidence, upon which the finding and judgment of the trial court were based, plaintiff was never

employed by the defendant; and the services he rendered were entirely unsolicited; that, at most, plaintiff had but a naked verbal option for which he paid nothing and for which defendant received nothing. In stating the law applicable to these facts, assuming that the court came to a proper conclusion thereon, the court said:

"When a real estate broker asks and obtains from the owner the price of certain real estate, or the price at which the owner is willing to sell, that, without more, does not establish the relation of principal and agent between the owner and broker; it does not establish a contract of employment. If the rule were otherwise, no one would be safe in stating the price of his own property in the hearing of a broker. * * * It is contended, as plaintiff found a purchaser ready, willing and able to buy within the time limited and upon the terms stated by defendant, he had fully earned his commission. * * * Such rule is not applicable in a case of this kind; it can only apply to a case when the contract of employment is admitted, or established by the evidence and where time is not of the essence of such contract."

In a subsequent Colorado case, Geier v. Howells, 47 Colo. 345, 107 Pac. 755, 27 L. R. A. N. S. 786, the court said:

"The burden was upon the plaintiff to establish that he was employed by the defendant to make a sale of his property which was sold to Mrs. Oakes. That he had not been employed and that the property had not been listed, with him prior to the time when he introduced Mrs. Oakes to the defendant, stands undisputed. Plaintiff did not know to whom the property belonged when he took Mrs. Oakes across the street to examine it. He then met the owner, inquired of him the price, said he had parties who might buy a house of that kind, introduced him to Mrs.

Oakes, and the only scintilla of testimony upon which to base a contract of employment is his own, to the effect that the defendant told him to go ahead and sell to them. A judgment based upon facts supported by substantial evidence will not be disturbed on review, but where it is but slightly supported by the evidence, or manifestly against its weight, or where a fact upon which the prevailing party predicates his right to the judgment rendered must be established by clear and convincing testimony, and if it is not, it cannot be permitted to stand. The defendant denied that he made the statement attributed to him by the plaintiff, and the testimony of the plaintiff himself not only corroborates the denial of the defendant, but demonstrates that what he claims the defendant said to him about making a sale to Mrs. Oakes is altogether improbable. * * * The plaintiff by accident brought the purchaser and defendant together. Prior to that time he had not been employed to sell the premises. He claims he was then employed by the defendant for that purpose. In such circumstances, the testimony relied upon by him to establish employment. should be clear and convincing. It lacks these essential requisites. For this reason, on the record before us, the judgment should have been for the defendant.''

In the case of Johnson v. Whalen, 13 Okl. 320, 74 Pac. 503, wherein it was held that, in the absence of an employment, authorizing a real estate agent to find a purchaser for or to make a sale of real estate by the owner no commission for an attempted sale can be recovered, and that a letter by a real estate agent to the owner, inquiring the price of the property, and a reply from the owner, stating that he would take $4000 net, does not upon its face authorize the real estate agent to find a purchaser for or to make a sale upon such terms, it appeared that the alleged broker wrote to the owner the following letter: ''We understand that you are the owner of (describing a quar-

ter-section of land in Kay County, Oklahoma). We have a purchaser for the same. If you will price it low enough so that he can buy it. Please give us the lowest cash price that will buy your farm by return mail." There was no reply to that letter. The broker again wrote the following: "On August 25th we wrote you relative to the price you would take for the (describing the land.) We failed to receive a reply from you. Will you take $3,800 cash for the above described land. Please advise us by return mail. Enclosed find stamped envelope for reply." The defendant answered that letter as follows: "Yours of the 15th inst. asking my price on farm there. Thirty-eight hundred will not buy it. Four thousand ($4000) will buy it net to me; and no less." Soon after that the brokerage firm sold the farm for $4300 and wrote defendant as follows: "We telegraphed you Friday evening the 14th that we had sold your farm for $4000 net to you. Enclosed we hand you deed to sign and return to the First National Bank of Newkirk, with instructions to be delivered to us upon the payment of the purchase price, less the amount of the mortgage now upon the land. * * *." Defendant replied as follows: "Your favor * * * with deed for me to sign is at hand. Will say that when I have been notified by the First National Bank of this city that there is $3,000 on deposit there, subject to the deposit of a deed from myself and wife, to the farm I own in your county, together with a contract from the purchaser that I shall not be held liable in any way for the taxes on this farm for this year, also the accrued interest on the $1000 loan on same, and any other expense that may appear against said farm. I understood that I was to have $3000 net to me and this is what I shall expect. Upon receipt of notice from the above named bank, that these things have been complied with, I will then have deed properly executed and place same in said bank. You can let me hear from you." To that letter the brok-

erage firm answered, declining to forward to the bank named by the defendant or to pay the interest on the $1000 mortgage as required, or to take a contract from the purchaser indemnifying defendant against taxes, but demanding that the deed be sent to the bank at Newkirk as they had previously directed. The opinion states that those letters contained all the evidence of the contract between the brokerage firm and the defendant. The evidence was demurred to and the demurrer sustained and a motion for judgment upon the pleadings and testimony was also sustained and judgment was rendered for the defendant for costs. The court said:

"There is only one question necessary to be considered by this court. To entitle a real estate agent to recover the commission for the sale of property, he must show the employment. Lawson's Rights, Remedies & Practice, Vol. 1, § 226. As before stated, the letters above quoted contained the only authority that Albright & Co. had to act as agent for Whalen in procuring a purchaser for the farm. The first letter was simply an inquiry as to the lowest cash price that would buy the farm, to which Whalen made no reply. The second letter was also only making inquiry as to whether he would take $3,800 cash for the farm, and the reply of Whalen was only to the effect that $3,800 would not buy it, but that $4000 cash net to him would. In short, the letters from Albright & Co. were simply letters inquiring the lowest price that Whalen would take for his farm, while the letters in answer by Whalen were simply stating his price, and that he would take $4000 cash net; and this was all the authority Albright & Co. had for selling the farm. It is clear Albright & Co. never had a contract with Whalen by which they were authorized to find a purchaser upon the terms attempted, and in the absence of an employment, authorizing a real estate agent to find a purchaser or make a sale of real estate, by the owner, no commission could possibly be re-

covered; and it cannot be successfully contended that there was an employment to make the sale attempted, even by implication.''

A judgment was affirmed in favor of the defendant and against the broker claiming a commission in Addison v. Wanamaker, 185 Pa. St. 536; 39 A. 1111, upon facts which may be briefly stated as follows: A real estate broker in Washington, D. C., called upon John Wanamaker, the owner of a residence in that city, inquired if it was for sale, and solicited the right to sell it as agent. The defendant told the plaintiff that he had not determined to sell, although circumstances might occur which would induce him to sell; that he would not put the house in the market for sale. That under no circumstances would he put the house in the hands of an agent to sell, nor would he employ any agent, and that if he did sell it, he would deal with the principal. That was the only interview between the plaintiff and the defendant upon the subject. Some time later the plaintiff wrote to defendant as follows: ''Some weeks ago I called on you to ask if you would sell your house on I street, and was informed that you had not decided what you would do with it. If you have decided to sell or rent, I would be glad to hear from you as I know of two parties who are anxious to purchase large houses in this city, and yours might suit one of them. An early reply is requested.'' The defendant replied as follows: ''Answering your letter asking whether my house is for sale, I beg to say that I have determined not to put it upon the market, and have no price for it. I am willing to entertain a reasonable offer from a bona fide satisfactory purchaser. The plaintiff then wrote defendant: ''Your favor of the 6th inst. duly received. One of my clients has purchased a house, but the other one referred to, Mr. Howland of New York, is anxious to inspect your property on Wednesday next, if you will grant permission. If you will allow me to show your property on Wednesday, please be good enough to name the hour

and oblige.'' To that the defendant replied: ''Answering your note of the 11th, saying that you would like to have permission to show my house to a Mr. Howland and asking for a time, I beg to say that, without putting my house into your hands to sell, I am quite willing that you should show it to your friend on Wednesday afternoon at three o'clock. Some time later in the same month the broker wrote to defendant as follows: ''I have been requested by Mr. Howland to ask you to put a price on your residence in this city, and also to ask if you would sell your gallery with the house. An early answer will greatly oblige.'' The defendant replied: ''I am not disposed to sell my pictures, and I do not wish to put my house in the market; though I should entertain the offer of a reasonable price for it.'' The defendant left Washington a few days thereafter, and had no other communication with the plaintiff.

Prior to his departure he placed the house in charge of a friend and associate in the department of the United States Government of which the defendant had been the head, and gave to him authority to sell the house at $90,000. Subsequently, plaintiff obtained from Mr. Howland an offer for the defendant's house and communicated the same by telegram to the defendant in Mexico, who telegraphed Mr. Hazen thereupon that the plaintiff had submitted an offer, in consequence of which plaintiff had an interview with Mr. Hazen regarding it. The offer was refused. A second offer was made and refused, and finally an offer of $90,000 made by Mr. Howland was submitted by the plaintiff and accepted by Mr. Hazen, acting for the defendant. When the offer of $90,000 was made, the plaintiff said to Mr. Hazen that he would, of course, expect the usual commission of two and one-half percent, and asked him to notify the defendant of that fact. Mr. Hazen said that he had no authority to discuss the question of commission and that it would have to be settled with Mr. Wanamaker. And he did not communicate the

plaintiff's demand for commission to the defendant. The
$90,000 offer having been accepted, terms of settlement
were agreed upon. Subsequently the plaintiff caused a
deed to be prepared and inquired of Mr. Nevin, a repre-
sentative of defendant, by letter at what time defendant
would sign it, and later wrote: ''I have the deed and will
send it to you in a few days. Of course Mr. Wanamaker
knows that he will owe me 2½ percent commission for
making the sale, as I notified his friend, Genl. Hazen, to
that effect when the offer was first made.'' Mr. Nevin
replied: ''I am in receipt of your favor of the 12th inst.
and whenever you are ready to forward the deed it can
be sent to me and I will see that it is executed. Regarding
the question of commission, I have nothing to do with this
part of the transaction and therefore do not know any-
thing about it.'' The deed was thereupon sent to Mr.
Nevin, though the contents of the letter claiming a com-
mission were not communicated to defendant prior to the
delivery of the deed. On the day of its delivery plaintiff
wrote to defendant demanding his commission. The trial
court, in stating its conclusion upon the facts, said:

''It was conceded that there was no express contract
with the defendant to negotiate for a sale of his house,
nor any express agreement to pay plaintiff a commission
for the sale. The plaintiff contends that the correspond-
ence and the subsequent negotiations and sale of the house,
constitute an implied contract to pay him the usual com-
mission, and that the acceptance of Mr. Howland's offer
and the subsequent acts of the plaintiff to the close of the
transaction constituted a ratification of the plaintiff's
agency for the defendant. It is clear that a contract to
pay a broker a commission for sale may be implied from
the circumstances of the case, and that such a contract
may be created by acceptance of services rendered: (cit-
ing cases). But an employment of an agent must be af-
firmatively established by such an implied contract or a
conscious ratification: (citing cases). It is clear that

the defendant refused at the interview between them to allow the plaintiff to sell the house. When the plaintiff had obtained the consent of Mr. Howland to examine the house, he then wrote to the defendant for permission to show it to him; the defendant then gave that permission in his letter above quoted in full, but carefully limited and restricted the right which might be implied from that permission by saying 'without putting my house into your hands to sell I am willing you should show it.' No contract to employ the plaintiff can be implied from this, the initial step in the relations of the parties, in respect to the sale. Nothing, in the opinion of the referee, occurred in the subsequent relations between plaintiff and defendant to alter the status established by the interview between the parties and by this letter. No contract can, therefore, be implied from the facts succeeding the letter containing the above statement, in contradiction of its express terms, nor can the defendant be held to be bound to the plaintiff upon any principle of ratification of acts which had their inception in an express refusal of the right to perform for the defendant that which the plaintiff did, in spite of such refusal.''

The Supreme Court in affirming the judgment said:

''Plaintiff averred in substance that, acting for the defendant as his real estate broker, he effected the sale and thereby earned the commissions claimed. The defendant, on the other hand, denied that he ever employed plaintiff to sell the property or procure a purchaser therefor, and also denied that he owed him the sum claimed or any sum whatever. It was, of course, incumbent on the plaintiff to prove a contract, express or implied, with the defendant. In that he signally failed. The evidence tended strongly to prove that he had two clients or customers, each of whom wished to buy property similar in grade, etc., to that of the defendant. For one of these he finally arranged, through defendant's agent, satisfactory terms

of purchase, and the property was subsequently conveyed accordingly; but there is not a particle of evidence that the plaintiff was ever authorized by the defendant to represent him in the transaction. On the contrary, the defendant appears to have been studiously careful to avoid saying or doing anything from which an inference of employment as his agent for any purpose, might be drawn. The plaintiff's suggestion, that irrespective of any contractual relation, whatever, between the broker, and the vendor, it is customary for the latter to pay the commissions of the former, and therefore he is entitled to recover, cannot be entertained. No such viciously bad custom as that should ever be recognized, unless it has been previously made the subject of agreement between all the parties concerned—vendor, vendee and the broker.''

The case of Morton v. Barney, based upon correspondence between broker and owner, reported in 140 Ill. App. 333, seems also to be fairly in point. The report of the case contains a copy of the correspondence, but we think the general nature of its contents, so as to understand the effect of the decision, may be gathered from what we shall quote from the opinion in the case. The court said:

''Appellees failed to prove any employment as brokers * * *. The only evidence relating to such employment is, first the fact that appellee Barney called on King and that thereafter * * * submitted to Kelley, Maus & Co. an offer which he stated he was authorized by King to make, viz: to sell to said Kelley, Maus & Co. the north half of the dock strip which appellant and King then owned, for $158,000, or to lease the same for ninety-nine years at a stated annual rental; second, the fact that Barney wrote King * * * that he had submitted said propositions to Kelley, Maus & Co., to which letter no reply was made; third, that January 25, 1902, Barney wrote King that he learned Kelley, Maus & Co. were 'negotiating direct for a lease of your dock property' and

stating that Kelley, Maus & Co. were appellees' customers; fourth, a letter from King to Barney in which King states that he gave Barney 'a price at which we would sell certain property on the west side which we own' and added 'If you have any further commission from me I shall be pleased to be advised of it immediately;' fifth, appellees' reply to that letter in which he calls attention to his own letter of August 16, 1901, to Kelley, Maus & Co., a copy of which he enclosed, and to his letter of August 27, 1901, to King 'informing you of the fact that we had submitted the property in question to Kelley, Maus & Co. either for purchase or lease.' It is apparent, we think, that this evidence fails to present any actual proof that King ever employed appellees or either of them as his broker.  *  *  *  Barney's own letters could furnish no evidence against King, and if they could do so they contain no suggestion that King had ever employed him in any capacity whatever. Nor does King's letter furnish any such evidence.  *  *  *  There is no warrant for the claim that where a broker goes to an owner asking and receiving the price of a piece of property he thereby becomes the agent of the owner entitled to commissions, if the owner subsequently disposes of the property. Nor can a broker by letters of his own addressed to a possible purchaser or by writing an owner that he has offered the property to such proposed purchaser make a contract of employment for himself entitling him to commissions. It takes two to make a contract of that kind, and an owner is under no obligation to respond to every letter he may receive from a real estate broker whom he has not employed. King, so far as the evidence tends to show, would have been under no obligation to sell or lease the property to Kelley, Maus & Co., had they chosen to accept the proposition submitted to them by Barney in his letter of August 16, 1901.''

The judgment in the case will be affirmed upon the grounds above stated.

*Affirmed.*

BLUME and KIMBALL, JJ., concur.