WILLIAM V. DELAHUNT, Appellant, v. CHARLES H. THUENER.— 296 S. W. 86.

Division Two, June 23, 1927.

**SALE: Commission: Volunteer: Implied Contract.** Where a broker acts as a mere volunteer he is not entitled to compensation, although his services are the efficient cause of bringing the vendor and vendee together and result in a sale. To entitle him to a commission he must have been employed to negotiate the transaction in connection with which his services are rendered. Where plaintiff telephoned defendant that he was sending Pfeiffer to him and that Pfeiffer would buy a manufacturing company, but did not tell defendant that Pfeiffer was not his client or that plaintiff would expect a commission if defendant made a deal with Pfeiffer, there was no contract, express or implied, between plaintiff and defendant, but plaintiff was a mere volunteer, and defendant having gone ahead and negotiated a sale of the property to Pfeiffer's company and received from the vendor a commission, plaintiff is not entitled to recover from defendant a part of the commission so received by defendant, upon a **quantum meruit** or otherwise, although defendant was a mortgagee of the vendor and his primary purchase in negotiating the sale was to collect the debt due him.

---

Corpus Juris-Cyc. References: **Brokers,** 9 C. J., Section 58, p. 555, n. 93; Section 82, p. 583, n. 68; Section 129, p. 657, n. 56.

Appeal from Circuit Court of City of St. Louis.—*Hon. J. Hugo Grimm,* Judge.

317 Mo. Sup.—30.

AFFIRMED.

*McDonald & Just* and *Glendy B. Arnold* for appellant.

(1) Plaintiff made a prima-facie case which, if believed by the jury, would entitle plaintiff to the recovery of the reasonable value of his services under the well-known principle that when one person performs valuable services for another at the latter's request, the law implies a contract to pay the reasonable value of the services. Sprague v. Sea, 152 Mo. 327; Piper v. Allen, 219 S. W. 98; Wagner v. Edison Co., 177 Mo. 44; Crain v. Miles, 154 Mo. App. 338; Silver v. Railroad, 125 Mo. App. 402; Kostuba v. Miller, 137 Mo. 174; Lillard v. Wilson, 178 Mo. 145; Horn Trunk Co. v. Johns, 202 S. W. 427; Coffman v. Dyas Realty Co., 176 Mo. App. 692; Lane v. Cunningham, 171 Mo. App. 17. (2) Plaintiff made a prima-facie case for the jury by showing (a) that defendant requested plaintiff to send prospective purchasers to defendant; (2) that plaintiff interviewed Pfeiffer, who was caused by plaintiff to communicate with defendant, and (3) that defendant sold the property to Pfeiffer's company through Pfeiffer and received a commission for the sale. Cases cited above.

*William F. Smith* and *Jones, Hocker, Sullivan & Angert* for respondent.

(1) A broker is not entitled to compensation for his services in the absence of a contract, express or implied. Ballentine & Boone v. Mercer, 130 Mo. App. 605; Pipkin v. Horne, 68 S. W. (Tex.) 1000; Summa v. Dereskiawicz, 82 Conn. 547; Benedict v. Pell, 74 N. Y. Supp. 1085; McKeon v. Tyler, 149 N. E. (Mass.) 615; City Builders' Finance Co. v. Stahl, 106 So. (Fla.) 77; Toumlin v. Millar, 58 L. T. 96, 3 T. L. R. 836; Moody v. Kettle (Can.), 11 Dom. L. R. 844; 9 C. J. 583. (a) A broker acting as a mere volunteer is not entitled to compensation. Ham Lead Co. v. Catherine Lead Co., 269 Mo. 662, 9 C. J. 554; 4 R. C. L. 298. (b) A contract to compensate a broker for his services will not be implied where there is an express contract that he shall receive no compensation therefor. Walker v. Brown, 28 Ill. 288; General Hospital v. Fairbanks, 129 Mass. 78; Sullivan v. Railway Co., 135 Mich. 661; 6 R. C. L. 589, sec. 8. (c) Mere fact that broker procures a purchaser does not impose liability upon seller to compensate him. Ballentine & Boone v. Mercer, 130 Mo. App. 614; Geier v. Howells, 47 Colo. 345, 107 Pac. 255; Walton v. Clerk, 54 Minn. 341, 56 N. W. 40; 9 C. J. 554, sec. 58. (d) A promise to pay without any obligation on the part of the promisor so to do is without consideration and void. Shark v. Hookes, 74 N. J. L. 191; Dilwig v.

Milwaukee Mach. Co., 182 N. W. (Wis.) 726; Myers v. Dean, 132 N.
Y. 65; Conant v. Evans, 202 Mass. 34.   (e) These parties were not
brokers, and usages in that profession did not enter into their nego-
tiations.   17 C. J. 460, 461; Long v. Armsby, 43 Mo. App. 268;
Bernard v. Mott, 89 Mo. App. 403, 411.   (2) A broker cannot recover
of the seller in absence of evidence that he was acting on the latter's
behalf and where the evidence indicates that he was acting on the pur-
chaser's behalf.   Downing v. Buck, 135 Mich. 636, 98 N. W. 388;
Viley v. Pettit, 29 S. W. (Ky.) 438; Good v. Sears, 226 S. W. (Tex.)
463.   (3) A broker cannot recover of seller when he was not the
efficient or procuring cause of sale.   English v. Page, 236 S. W. 392;
Bigham v. Linville, 170 Mo. App. 354; McCrary v. Kellogg, 106 Mo.
App. 597; Low v. Paddock, 220 S. W. 969; Spotswood v. Morris, 12
Ida. 360, 85 Pac. 1094; Pitts v. Pitts, 164 Pac. (Okla.) 1172.


HIGBEE, C.—Plaintiff, on January 20, 1923, sued the defendant
in the Circuit Court of the City of St. Louis, for $20,000, as alleged
in the petition, on a *quantum meruit* for services rendered at defend-
ant's request in finding and introducing a purchaser for the corporate
assets of the Sanitol Chemical Laboratories Company of St. Louis.
At the trial on December 3, 1924, the court sustained a demurrer to
plaintiff's evidence; plaintiff suffered an involuntary nonsuit with
leave, and appealed.

The petition alleges that the said Sanitol Company was, on Novem-
ber 20, 1921, a corporation engaged in manufacturing and selling
toilet preparations and other chemical products, with its plant and
main office in St. Louis; that H. C. G. Luyties, at the time of his
death, September 17, 1921, was its principal stockholder, president
and manager; that at that time the defendant held the notes of said
company for $165,000, with interest, which were indorsed by said
Luyties and secured by the pledge of Luyties' shares of stock in said
company; that on November 23, 1921, plaintiff told defendant that
plaintiff intended to seek a purchaser for the assets of said company;
that defendant told plaintiff that he, the defendant, held Luyties'
shares of stock; that he was in control of said company and could
make a better deal for a purchaser of the assets of the company than
could be made by its officers.

The petition further alleges that at defendant's request he went
through the company's plant and took from defendant a copy of the
report of the auditors of said company, showing its financial condi-
tion, to enable plaintiff to show his clients the large business and op-
portunity for investment furnished by that company's plant and
business; that soon thereafter, he interested G. A. Pfeiffer, vice-
president of William R. Warner & Company, a corporation, in the
purchase of the assets of the Sanitol Company and, as previously re-

quested by defendant, sent said Pfeiffer to defendant on November —, 1921, who began negotiations with defendant for the purchase of said assets, which resulted in the sale thereof to the said William R. Warner Company for the sum of $425,000, on or about January 28, 1922, and that for the negotiation of said sale the defendant received $20,000 from the estate of said H. C. G. Luyties, as a commission or compensation for his services in effecting said sale. That plaintiff found and sent said purchaser to defendant at defendant's request and so notified him at the time, and that defendant, knowing plaintiff was exerting himself to find a purchaser for said assets at defendant's special instance and request, thus enabling defendant to make said sale, and that plaintiff expected to be paid therefor, and that defendant thus induced the efforts of plaintiff, accepted the aforesaid benefits of plaintiff's services, thereby agreeing to pay plaintiff the reasonable value thereof, which reasonable value is $20,000. Wherefore plaintiff prays judgment.

The answer is a general denial.

Plaintiff testified: I have lived in St. Louis twenty-seven years; am secretary and treasurer of the St. Louis & St. Charles Bridge Company, and of the Commonwealth Trust Company. I operate a small pharmaceutical company. I knew about the Sanitol Laboratories Company in 1921. I was in a similar business from 1918 to 1921, as sort of an agent for the trustees for the Allan-Pfeiffer Chemical Company. I had known the defendant, Mr. Thuener, a good many years, more intimately since the fall of 1918, because at that time he was associated in the reorganization of the Allen-Pfeiffer Chemical Company. I knew Mr. Luyties slightly, and I knew of the company, and a month or so after he died I thought I would ascertain what the condition of the business was. I was referred to Mr. Thuener. I went to see him in November, 1921, and told him I wanted to make some inquiries about the Sanitol Company; that I understood he held its indebtedness, and he said he did. I wanted to know the condition of the company, how much it owed, who was running it, what their business was, and general information about the company. He told me they owed him $165,000, described the things I have just mentioned, their real estate and the amount of business they did in certain years. It was very attractive. I asked him how much he would take for his debt and he said $165,000, but he would not pay any commission for collecting his debt. I said I was not interested in collecting his debt, but I was interested in getting a purchaser for the property. He said a short time before Luyties had been offered $750,000 for it; he said he believed the offer was made by the Pfeiffer Chemical Company. That company is the original Warner Company here in St. Louis. Pfeiffer is president of the Warner Company. Thuener made a

memorandum (which witness produced) showing what a purchaser would get if he acquired his debt; assets, $440,000; liabilities, $181,-000. Thuener suggested we look over the property, and we went to the factory and he introduced me to Mr. Werbe, one of the officers, and to Mr. Malone, the superintendent, who showed me through the plant, and we returned to Thuener's office. He said bring your parties to me, don't go near those people, they will only mess it up; they can't do anything; they want to keep their jobs. I am the only man who can make a deal. I am in control of the property and you bring them to me.

After some inquiry plaintiff was referred to Mr. Pfeiffer. Plaintiff sent to defendant and got an audit of the Sanitol Company and went to see Pfeiffer, at the office of William R. Warner Company, and Pfeiffer went over the audit furnished by the defendant. Witness continued: Pfeiffer said: "We would like to know who you represent, what your interest is." I told him we were not expecting him to pay a commission, that I came primarily to interest Mr. Merner. Pfeiffer had a report on the Sanitol Company and said he would see Mr. Werbe, its president. I told him there was just one man, Mr. Thuener, who could make a good deal with him. He didn't know Thuener and I gave him his name and telephone number and he said he would see him. I telephoned Thuener that I had seen Pfeiffer and Pfeiffer would buy the property. Thuener said, "All right, that's fine." I met Thuener in a few days and he told me that he and Pfeiffer had had an interview and the trade was progressing. I didn't see Thuener for about a month and a half. It had been reported that the property had been sold. I asked him about it and he said it hadn't been quite closed. He said, "Do you expect me to pay you anything?" I said, "When we first talked about this you said you wouldn't pay anything for collecting your debt." I said, "If you didn't get your money on that basis you wouldn't owe me anything." A few weeks later I asked him if he got any commission and he said "No." He said Pfeiffer asked him if he got any commission and he told him he did not. I said, "Whether you get a commission or not, you ought to pay me something because you made this deal." I said, "I don't think you owe me anything legally, but you ought to pay me something." He said, "I will see if I can get you something; I will see Pfeiffer and you leave it to me." I didn't see him again until in July. He said he got no commission and I said he ought to pay me something. He said how much? I said I would leave it to him and he said he would send me a check, but it wouldn't be very much. Then I went to the probate court and found the order authorizing the payment of $20,000 commission to the defendant. I telephoned him I had been to the probate court and found the order. I said: "That puts a different light on it and I won't talk

to you any more. I expect you to pay me.'' That was our last interview. I regard $10,000 as the fair value of the services I rendered Mr. Thuener.

Cross-examination: I told Thuener I knew somebody who would be interested in buying this property. I did not tell him who it was. I had Mr. Merner (Pfeiffer's nephew) in mind. I knew both the Pfeiffers. I was in the drug business. Gus Pfeiffer was president of the Warner Company. He discouraged me about Merner, but said he was interested. He produced a memorandum on which was Werbe's name as executor of Luyties' will. He said he supposed he would see Werbe. I didn't think he could make a deal with Werbe. I impressed on him he could buy the property awfully cheap, if necessary, at its junk value. Luyties was practically the Sanitol Company; he was in control of it. Thuener had all of Luyties stock as collateral on his loan, and in addition all his personal property and residence and some real estate. I think my services are worth $10,000. I enabled Mr. Thuener to make $20,000. I persuaded Pfeiffer to see Mr. Thuener. I told Thuener he ought to pay me something because he was put in a favorable position; a moral obligation entirely.

Redirect: I expected to be paid for the services I rendered Thuener in producing a prospective purchaser. In the first interview Mr. Thuener told me Mr. Luyties had been offered as high as $750,000.

Recross: I had in mind to charge the seller a commission if I sold the property. I didn't have in mind any particular name, but I had in mind in a general way the seller. I believe the Sanitol Company was the owner. When Thuener urged me to bring a prospect to him and not to the company my intention was, if I brought a customer to him and he received any commission for it, to charge him. The order to pay Thuener a commission was filed in the probate court, January 19, 1922.

''Q. When you started this matter with Thuener, you expected, if you made a sale to your people, your clients, to be paid by the owner for effecting the sale, if you did effect it? A. I didn't have it very specific in my mind. I expected to be paid and the natural inference or feeling was that I would be paid by the owner of the property. Going to Mr. Thuener as I did, sort of changed the whole current of it. He urged me to bring anybody I might have to him and stay away from the Sanitol people.

''Q. It was only after you found out Thuener had received a commission from the Luyties estate that you made any legal claim upon him for a commission? A. No: I made a claim on him, but it was not a legal claim, because I thought he would only be morally bound to pay me something. He didn't give me to understand he had any other interest in the company or the sale of the property

than to get his money, and that he controlled it. He could only get back his money plus the interest.

"Q. Unless there was some arrangement to pay a commission? A. Yes.

G. A. Pfeiffer testified by deposition: I live in New York City. I am in the manufacturing business with William R. Warner & Co., Inc., engaged in the manufacture of medicinal and toilet preparations. I met Delahunt in the fall of 1921. We bought the Sanitol Chemical Laboratories in St. Louis two years ago, after Mr. Luyties' death. I first talked about the purchase of the Sanitol Company with my brother. A short time afterward I saw Mr. Delahunt at our office in St. Louis. He inquired about my nephew Mr. Merner, who was in Europe and no longer connected with us. I told Delahunt our company was always interested in investigating concerns which were for sale. I pointed to a slip on my desk to remind me to call up Mr. Werbe regarding this very matter. Delahunt said Werbe was not the proper person to approach; that Mr. Charles Thuener was the man, the man in a sense in control, and gave me Thuener's name and telephone number. I brought up the question of commission of Mr. Delahunt. Delahunt had an auditor's report of the Sanitol auditors, either at that time or at a subsequent visit. I know I told Delahunt I intended to call Mr. Werbe, but he said Charles Thuener would be the right man to call. He was the first man to mention that Thuener might enter into the sale. I had not known Thuener before in connection with that affair. I began negotiations with Thuener very soon after this talk with Delahunt; they were continued until its purchase was consummated. Delahunt's visit was in September, 1921.

Cross-examination: . I told Mr. Delahunt that being the buyers, we never feel under obligations to pay the commission; we consider that is something for the seller to pay. He volunteered the statement that so long as Mr. Merner was not interested, he was not there to make any commission; that so far as we were concerned that was not the object of his visit. He did not say he represented the Sanitol Company or any interest in the company. I cannot say that I ever mentioned Delahunt's visit to Thuener. Delahunt did not participate in our negotiations. The sale was not consummated until in January, 1922. I had known the Sanitol Company for many years and was acquainted with Mr. Luyties, and had in mind the possibility of acquiring that company. I knew it was not in sound financial condition and might be a matter of negotiation for sale. When my attention was attracted to Luyties' death, I wrote Mr. Merner; he did not want it; then we felt we would investigate it, and had it in mind to get in touch with those interested in this company's affairs with a view of negotiating for its purchase. I had no acquaintance with Werbe, Thuener or Delahunt.

Plaintiff read from the defendant's deposition, taken September 23, 1924: I knew all about Warner & Company and the Pfeiffer Company; did not know Gustave or Henry Pfeiffer personally, but knew of them and the company. The board of directors and Mr. Luyties, when I first went, were trying to make this loan. One of the things brought up, and they stated that Mr. Merner of the Warner Company had made an offer of $650,000 for that business, and Mr. Luyties said he would not take less than a million. Two or three days after Delahunt went to see Gustave Pfeiffer, Pfeiffer called me over the telephone and told me Delahunt had been to see him and said that Delahunt said that he, Pfeiffer, would find me a high class gentleman and the right party to talk with. That led to negotiations, but I had the Pfeiffers on my list long before Delahunt spoke to me.

There was evidence that if plaintiff found a purchaser for the Sanitol Company property and the sale was consummated, five per cent commission on $425,000 would be a minimum reasonable charge. Other evidence offered by plaintiff is merely cumulative and needs not be set out.

Thereupon the court sustained a demurrer to plaintiff's evidence, and the plaintiff took an involuntary nonsuit as heretofore stated.

Appellant insists he made a prima-facie case, which, if believed by the jury, entitled him to recover the reasonable value of his services on the principle that when one performs valuable services for another at the latter's request, the law implies a contract to pay the reasonable value of the services; that plaintiff made a prima-facie case for the jury by showing (1) that defendant requested plaintiff to send prospective purchasers to defendant; (2) that plaintiff interested Pfeiffer and sent him as a prospective purchaser to defendant, and (3) this resulted in a sale of the property by defendant to Pfeiffer's company and defendant received a commission for the sale. Hence the court erred in sustaining a demurrer to the evidence.

The plaintiff was not a broker. He had been in a business like that of the Sanitol Company. He had known Luyties and knew more or less about the business and affairs of the company and believed its purchase would be a profitable investment for his friend Mr. Merner, the nephew and former business associate of G. A. Pfeiffer, president of the William R. Warner Company, which was engaged in the manufacture of toilet preparations. In the course of his inquiries, he was referred to Mr. Thuener, who held the notes of the Sanitol Company for $165,000, indorsed by Luyties, and secured by a pledge of Luyties' shares of stock in the corporation. He told Thuener he intended to seek a purchaser for the assets of the company. It is averred in substance in the petition

that Thuener told plaintiff that he (Thuener) was in control of said company and could make a better deal for a purchaser of the assets than could be made with its officers; that Thuener showed the plaintiff through the company's plant and that plaintiff took from defendant an audit of the company's financial condition to enable plaintiff to show *his* (plaintiff's) *clients* the large business and the nature of the investment opportunity furnished through that company's plant and business.

Plaintiff testified he was referred to Mr. Thuener who told him about the business and financial condition of the company. It was very attractive. "I asked him how much he would take for his debt and he said $165,000, but he would not pay any commission for collecting his debt. I said I was not interested in collecting his debt, but *I was interested in getting a purchaser for the property."* In this interview Thuener told plaintiff that he was in control of the company and could make a better deal than the officers could who were only interested in holding their jobs, and for plaintiff to bring his parties (or client, as averred in the petition) to the defendant and not to go near those people (the officers) as "they will only mess it up; they can't do anything; they want to keep their jobs."

Plaintiff testified he called on Mr. Pfeiffer who went over the audit furnished by the defendant. Pfeiffer inquired whom plaintiff represented. Plaintiff told Pfeiffer he did not expect a commission from him, that he was not there to make a commission, that he came primarily to interest Mr. Merner. Pfeiffer said he would see Werbe, president of the company, but plaintiff told Pfeiffer to see Thuener who was the only man who could make a deal. This led to the negotiations with Thuener which resulted in a sale of the assets of the company to Pfeiffer for $425,000. Later, plaintiff learned that Thuener received a commission of $20,000 from Luyties' estate for his services in negotiating the sale. Then a great light dawned upon him; he conceived that he was morally entitled to one-half of the $20,000 commission.

When plaintiff phoned defendant he was sending Pfeiffer to him and that Pfeiffer would buy the property, he did not tell the defendant that Pfeiffer was not his client, or that plaintiff would expect a commission if defendant made a deal with Pfeiffer. So far, there was no contract, express or implied, that defendant would pay plaintiff a commission. When Pfeiffer came, defendant would naturally assume that plaintiff had sent him as his (plaintiff's) client and that plaintiff was acting in the interest of his client in sending him to the defendant and not in the defendant's interest. In the circumstances of this case it seems clear on plaintiff's own evidence that he voluntarily sent Pfeiffer to defendant as a pros-

pective purchaser and that in so dealing with Pfeiffer the defendant did not expressly or impliedly obligate himself to pay plaintiff any compensation.

In 9 Corpus Juris, 583, it is said: "A real estate broker and his sub-agent stand in practically the same relative position *inter se* with reference to the right to compensation as do the principal and the broker."

In 9 Corpus Juris, 554: "To entitle a broker to compensation, he must have been employed to negotiate the transaction in connection with which his services were rendered. In the absence of such employment, or in other words, where the broker acts as a mere volunteer, he is not entitled to compensation, although his services are the efficient cause of bringing the parties together and result in a sale or other contract between them."

In Welch v. Collenbaugh, 150 Iowa, 692, 130 N. W. 792, it is held that a real estate broker cannot recover commissions on a *quantum meruit* or otherwise without showing a contract of employment express or implied. See other cases cited in the notes.

In 4 Ruling Case Law, page 298, section 43, the doctrine is thus expressed: "As it takes two to make a bargain, a broker is not entitled to be compensated for his services unless they were rendered pursuant to the express or implied request of his employer. To warrant a recovery upon his part he must have been actually employed by the person he is seeking to hold liable, for otherwise there would be no legal basis for his claim to compensation notwithstanding the fact that a purchaser may have been found through information furnished by him. The calling of a broker is not preferred in the eyes of the law to that of other occupations, and he is no more entitled to remuneration for services voluntarily rendered without any employment, express or implied, than any other member of the community."

See also Ham & Ham Lead & Zinc Inv. Co. v. Catherine Lead Co., 269 Mo. 654, 662, 192 S. W. 407, and Ballentine & Boone v. Mercer, 130 Mo. App. 605, 614, 109 S. W. 1037.

The demurrer to the evidence was properly sustained and the judgment is affirmed. *Davis* and *Henwood,. CC.,* concur.

PER CURIAM:—The foregoing opinion by HIGBEE, C., is adopted as the opinion of the court. All of the judges concur.