EDWARD H. WINDSOR v. INTERNATIONAL LIFE INSURANCE COMPANY, Appellant.—29 S. W. (2d) 1112.

Division Two, July 3, 1930.

*Jourdan & English* and *David W. Hill* for appellant.

774

*W. B.* and *Ford W. Thompson, A. C. Britt* and *Jesse W. Barrett* for respondent.

DAVIS, C.—This is an action to recover for services rendered as a real estate broker. The petition averred employment and an agreement to pay for procuring a party ready, able and willing to trade an apartment house for farm property of defendant. The jury returned a verdict for $8,800 in plaintiff's favor. Defendant appealed. Plaintiff also appealed, and contends that the judgment, in view of the finding for plaintiff, should have been for $87,500, *non obstante veredicto.*

The evidence adduced on behalf of plaintiff warrants the finding that defendant, in 1924, was a life insurance company, operating in the city of St. Louis, and that it was the owner of farm lands located in various states. Plaintiff was engaged at said time in the city of St. Louis in the real estate business. From 1921 to 1923 he was a real estate salesman for an operator. Then he went into business for himself as a real estate broker. A. H. Carter, in 1924, was treasurer of defendant. About April 1, 1924, plaintiff went to Carter's office with a letter of introduction to him from a Mr. Cady of Pine Bluff, Arkansas, which he left with Carter. The letter was the result of plaintiff answering a blind newspaper advertisement. Upon presentation of the letter, Carter said he knew Cady. Plaintiff then informed Carter that he was the man that had been offering Mr. Cady the Gay, a business building in the city of St. Louis. Carter replied that he knew this building and would not be interested. Carter then said that he had a number of farms scattered over different states, Missouri, Arkansas, Mississippi and Illinois, and he wanted to trade them. About three days later, plaintiff again visited Carter and submitted to him a parcel of property located at Palm and Grand avenues in the city of St. Louis. In answer to questions, plaintiff relates the conversation as to the Grand and Palm property thus: ''A. He said it was a business building; he wasn't interested in it. He said he had it, was asked to make a loan, he knew it very well,

but, he said, 'What we want and would like to have you get some one for us, would be high class apartment property; that's what we are interested in.' . . . He said, 'That's not the kind of property we want. We want high class apartment property.' He said, 'If you will get some one that has high class apartment property, that's the kind of property we are hunting for,' he said, 'for our farm lands.' . . . He just said that he had them (farm lands) scattered over several states.'' Plaintiff answered, ''All right, sir, I will see what I can do.''

A few days later Frank Vrooman came to plaintiff's office. Plaintiff then saw Claude E. Vrooman about May 7th, and on May 9th plaintiff took Claude Vrooman to Carter's office and introduced him as the man who had the apartment house property to trade for his farm lands. Vrooman had stated to plaintiff that he was willing to trade apartment property for farm lands. They discussed the farm lands in general, but plaintiff could not say exactly what was said. About May 11th, Claude Vrooman furnished to plaintiff a statement relative to the Jeffersonian Apartment, which was submitted to Carter. Carter, accompanied by Frank Vrooman, visited and inspected the Jeffersonian building. Carter told plaintiff that he was not interested in the Jeffersonian. A few days later, plaintiff submitted a statement with respect to the Mauretania Apartment building. On May 27th plaintiff and Claude Vrooman went to Carter's office. The Mauretania Apartment was under discussion. They also discussed farm land in the Little River Drainage District. Vrooman said he was interested in it. They said it was very high class. Vrooman, Carter, plaintiff and Barton, a land appraiser for defendant, were present. Concerning a trip that Vrooman, Barton and others were to make to that district, plaintiff said: ''They were going down to look over some land down there which I really don't think belonged to the International.'' About ten days later plaintiff saw Claude Vrooman, who said they had a pretty bad trip, rainy and muddy. About June 10th or 11th, plaintiff again met Vrooman, who said that it looked like they were going to make a deal on the St. Regis. (The St. Regis was an apartment building owned by a corporation in which Claude Vrooman was a large stockholder.) He later saw Carter who said that the deal was coming on nicely, but slowly. Later plaintiff learned through the papers that defendant had traded its farm properties for the St. Regis Apartments.

On cross-examination, plaintiff stated that he went to Carter's office without an invitation, and that he was not acquainted with Carter prior to April 1st. Plaintiff did not show Carter the St. Regis Apartments. He said that he did not have the St. Regis or defendant's farm lands listed for sale or exchange. He never knew the defendant's farms or their description. He never in-

formed Carter that defendant owed him money, and never submitted a bill to Carter or defendant for services rendered prior to the filing of the suit. After the exchange of the properties, he met Carter on the street, but did not then state to Carter that defendant owed him anything. This suit was the first intimation to the defendant that plaintiff claimed anything for services. Plaintiff said that he was at that time the agent of the St. Regis Realty & Investment Company in attempting to sell its properties; that he was the broker. Plaintiff filed suit against defendant, St. Regis Realty & Investment Company and Claude E. Vrooman, but dismissed the action against the corporation and Vrooman upon receiving from them $1,000 in settlement of his claim. He did not take lists of the farms and show them to Vrooman, but he took the lists of Vrooman.

The deposition of Carter was offered by plaintiff on the theory of an admission by defendant. It tends to show that Carter in 1924 was the treasurer of defendant. His duties concerned the real estate. He had a hand in the sales, but could not say that he had charge of it, because sales under the charter were made by the board of directors. Generally negotiations for a sale were presented to him. The sale of the company's lands was the subject of correspondence with J. P. Cady of Pine Bluff, Arkansas. Cady was not the agent of defendant. Carter had no business transactions with Cady. Plaintiff went to see Carter in regard to exchanging some lands with him, and told him he had some through Mr. Cady. While witness had some correspondence with Cady relative to the Gay Building, he did not recollect that plaintiff ever mentioned it. He recollected that plaintiff presented property for trade located at Grand and Palm, but he was acquainted with the property and did not consider it. He did not recollect telling plaintiff that defendant was willing to sell these farm lands for income-bearing property in St. Louis. Plaintiff also discussed the trade of the Jeffersonian and Mauretania apartments for defendant's farm lands. Carter inspected the Jeffersonian Apartment, and Frank Vrooman went with him. He also met Claude E. Vrooman there. Plaintiff arranged the inspection trip. This was the first occasion of meeting Claude E. Vrooman as to a trade of apartments for farm lands. The next afternoon plaintiff brought Claude Vrooman to Carter's office, but an exchange of farm lands was not discussed, as defendant was not interested in the Jeffersonian. The exchange of farm lands for other property owned by Vrooman was not discussed. Defendant's lands in the Little River Drainage District were not discussed; however, Vrooman was on a trade for land owned by Himmelburger-Harrison Lumber Company in the Little River Drainage District; that trade was discussed, and Vrooman went there to look over the lumber company land, taking Barton, defendant's

appraiser, with him at his expense. The apartment to be traded for the lumber company land was not mentioned to Carter's knowledge.

To the best of Carter's memory, the deal with respect to the exchange of defendant's farm land for the St. Regis Apartment was first broached in July or August. During the middle of the summer, Paisley, elected president of defendant corporation on May 8, 1924, called Carter to his office. Vrooman was there, discussing the trade with Paisley, who requested Carter to bring a list of defendant's land to them. A portion of the land exchanged for the St. Regis was in the Little River Drainage District, so Carter thought. All conferences with plaintiff were in April, 1924. The first time that the land that defendant was willing to trade for apartments was segregated was when Carter took the list to Paisley.

Carter said that plaintiff did not represent defendant as broker in any way; nor did defendant ever employ him as broker to find properties for exchange; nor did defendant employ him as broker to sell land; nor give him a contract as agent to sell land; nor did plaintiff speak about representing defendant as broker or agent. Plaintiff's position or attitude was that of agent for the properties he submitted to defendant. The subject of the sale of the St. Regis was never mentioned in the presence of plaintiff. Carter did not ask plaintiff to find apartment property for defendant. All propositions came as original propositions from plaintiff to Carter. Plaintiff never demanded payment or submitted a bill for services rendered. Until Paisley called him in, Carter had never discussed the sale of the St. Regis with Vrooman. Carter said that plaintiff brought propositions to him, and that he was representing the other parties. Defendant had no agents. Carter said plaintiff came into his office with these offers, which he rejected. Carter's deposition reads:

"Q. You were expecting him to bring somebody to you who would make you a proposition which you might be willing to accept, were you not? A. We might do that if he made the right kind of a proposition.

"Q. And he did bring to you and let you know that he had a man, Mr. Claude Vrooman, who was possessed of property of a kind that might interest you, did he not? A. He did *not*.

"Q. And as the result you negotiated, together with Mr. Paisley, with the gentleman, Mr. Vrooman, and you did make an agreement with him? A. *No, sir.*"

The deposition shows that the word *not*, italicized, was inserted and written in in ink. It also shows that the word *No*, italicized, was inserted and written in in ink, and that the word "Yes," in typewriting, was stricken out. The reporter taking the deposition testified that his notes show that Carter answered the question,

"He did," and, "Yes, sir," and that the word *not,* after "He did" was written in in ink, and that the words "Yes, sir" were changed to "No, sir," apparently by the witness at the time of signing the deposition. On cross-examination, the reporter said that a witness has the privilege of correcting a deposition before signing it. His testimony developed other corrections in the deposition; also errors.

Defendant's evidence tends to show that Paisley became president of defendant on May 8, 1924, and continued until September 1, 1925. Before that he was president of the Standard Life Insurance Company, and, while president of the Standard, negotiations were opened with Vrooman, relative to the exchange of the St. Regis Apartment for the Standard Life Insurance Company building in Decatur. Knowing of Vrooman's desire to sell the St. Regis, Paisley sent for him, after he became president of defendant, relative to trading the St. Regis for defendant's farm lands. He requested Carter to furnish him a list of defendant's lands. Plaintiff did not assist in the deal in any way. Paisley had never heard of plaintiff until suit was filed. Paisley knew nothing of plaintiff's meetings with Carter and Vrooman. Carter testified for defendant and his evidence tended to show that he never employed plaintiff as an agent or broker of defendant, and never agreed that defendant would pay plaintiff any commission on any deal. He never solicited plaintiff to do anything for the company or asked him to come to his office. Plaintiff, without request, submitted a number of places which were turned down. He never asked plaintiff to produce some one who would trade lands or apartments. Plaintiff never advised him that he expected a commission from defendant on any deal. Other facts, if any, necessary to a discussion of the issues, will be adverted to in the opinion.

I. A broker's right to be compensated, following the sale or trade of an owner's real estate, is predicated on an express or implied contract of employment. A volunteer broker, even though he is the efficient or procuring cause of the sale or trade, may not enforce compensation, as his service will be held to be gratuitous. [Delahunt v. Thuener, 317 Mo. 465, 296 S. W. 86; 9 C. J. 554; 4 R. C. L. 298; Stevens v. Brimmer, 35 Wyo. 452, 251 Pac. 1, 49 A. L. R. 919.]

The evidence demonstrates beyond a doubt that plaintiff approached defendant's treasurer either as the owner of the Gay Building or as the representative of the owner. He came unheralded and unknown, with a letter of introduction. His approach was for the purpose of making an offer, an offer to trade the Gay Building for defendant's farm lands. The offer was not accepted. A few days later, again unsolicited, he visited defendant's treasurer in his office,

and, on this occasion, offered to trade a building located at Palm and Grand avenues to defendant for its farm lands. This offer was not accepted. Plainly, the status of plaintiff was that of an offerer, making an offer, and that of defendant an offeree, refusing to accept an offer. To this point, the evidence does not suggest the semblance of a contract of employment, either express or implied. Certainly, no confidential relation existed, for they dealt at arm's length, as traders. Nor do we understand that the plaintiff contends otherwise.

However, plaintiff contends that, pursuant to the statement of the treasurer of defendant that it was not interested in business buildings, a contract of employment arose from the treasurer's statement to plaintiff, ''What we want and would like to have you get some one for us, would be high class apartment property; that's what we are interested in,'' and ''we want high class apartment property. If you will get some one that has high class apartment property, that's the kind of property we are hunting for for our farm lands,'' and from plaintiff's response, ''All right, sir, I will see what I can do.''

We do not think the evidence tends to show an express contract of employment of plaintiff by defendant. Plaintiff voluntarily appeared in defendant's office and made an offer to exchange property for its property. There is no showing that defendant listed its farm lands with plaintiff. Nothing was said regarding compensation to be received by plaintiff or paid by defendant. Neither plaintiff's attitude nor his conversation advised defendant that he expected compensation from it. While it may be inferred that the treasurer understood that plaintiff was a real estate agent or broker, yet nothing was definitely said on the subject. The circumstances and appearances were such as to lead the treasurer to believe that plaintiff was representing adverse interests, to-wit, those for whom he made the offers. A contract arises from the meeting of the minds of the contracting parties, knowingly and understandingly entered into. Prior to the treasurer's statement to plaintiff to get some one with high class apartment property, the position and attitude of plaintiff was that of an offerer of property to defendant, for himself or the representative of others. Unless plaintiff gave the treasurer to understand or informed him that he was acting for defendant, the treasurer was authorized to assume that he represented others. So, when the treasurer advised him to get some one with high class apartment property, in view of plaintiff's attitude as an offerer, the statement of the treasurer may be interpreted to mean nothing more than we are not interested in business property, but if you will offer us for yourself or your customer high class apartment property in exchange for our farm lands, we will consider a trade. The record is wanting in evidence that plaintiff

caused the treasurer to understand that he intended or assumed to represent defendant as its agent or broker. Moreover, plaintiff admitted, for he could not very well do otherwise, as he sued Claude E. Vrooman and the St. Regis Realty & Investment Company for a commission growing out of the same transaction, that he was the agent or broker of said corporation. This admission interprets the evidence as showing that plaintiff presented himself to the understanding of defendant's treasurer in the attitude of an offerer of property and the representative of others.

Nor do we think the evidence is sufficient to develop an implied contract of employment. The clearest statement of the applicable rule is found in the annotation to Reeve v. Shoemaker (Iowa), 205 N. W. 742, 43 A. L. R. 839, l. c. 850, reading: "Where a broker approaches an owner of real estate and negotiates for the purchase of certain of his property, no promise to pay for the broker's services voluntarily rendered will be implied if the owner is justified by the circumstances in presuming that the broker is a prospective purchaser or is representing a prospective purchaser in the negotiations." Before an owner may become liable upon an implied contract, it is essential that the owner know or has reasonable ground to believe that the services of the broker are to be rendered with the expectation of receiving payment therefor. On this subject, in Atwater v. Lockwood, 39 Conn. 45, l. c. 49, the court say: "Unless the defendant knew while the service was being rendered that the plaintiff was acting for him, or had such information on the subject as would cause a person of ordinary understanding under like circumstances to believe that he was so acting, no implication of employment can be made. A contract is the meeting of the minds of the contracting parties, and where there is no express contract, the party sought to be charged must have such knowledge, or what is equivalent thereto, before his mind can act on the subject, and assent to the terms of the contract." [Weinhouse v. Cronin, 68 Conn. 250, 36 Atl. 45.] In Segnitz v. A. Grossenbach Co., 158 Wis. 511, l. c. 514, 149 N. W. 159, the rule is stated thus: "In order to raise an implied contract to pay for services several things are necessary . . . First, the services must have been performed under such circumstances as to give the recipient thereof some reason to think they are not gratuitous, not performed for some other person, but with the expectation of compensation from the recipient . . . Second, in order to raise an implied contract to compensate for them, the services must have been beneficial to the person sought to be made liable." [43 A. L. R. 843.]

The evidence demonstrates that plaintiff approached defendant unsolicited; that defendant did not list its farm lands with plaintiff; and that compensation to be paid was not mentioned. It follows

that the surrounding facts and circumstances justified defendant's treasurer in presuming, even though he suggested that plaintiff get some one with high class apartment property, that plaintiff was a prospective purchaser or the representative of a prospective purchaser in the negotiations. The situation before the treasurer evolved nothing that would lead a man of ordinary understanding under like circumstances to assume that plaintiff was acting for defendant. The evidence fails to show that there was a meeting of the minds, for the evidence does not charge defendant with knowing or understanding that plaintiff assumed to represent it. Plaintiff's actions in approaching the treasurer warranted the assumption that the services were being performed for some other person, for nothing was said or done that tended to show that defendant understood that plaintiff expected to be compensated by it. Plaintiff could not become the representative of defendant, so as to make defendant liable to him for services rendered, without the consent of defendant, knowingly and understandingly given. If plaintiff rendered defendant any service, he did so as a volunteer. Plaintiff says that he represented, as agent or broker, the corporation of Vrooman in the trade of the St. Regis Apartments. This was inconsistent with his alleged contract to represent defendant, for it warrants the assumption that he interested himself in Vrooman's behalf rather than that of defendant, and, consequently, no promise to pay for services rendered may be implied.

II. Plaintiff maintains that, through the evidence of Carter, defendant admits the existence of the contract. The testimony relied on reads:

"Q. You were expecting him to bring somebody to you who would make you a proposition which you might be willing to accept, were you not? A. We might do that if he made the right kind of proposition.

"Q. And he did bring you, and let you know that he had a man, Mr. Claude Vrooman, who was possessed of property of a kind which might interest you, did he not? A. He did.

"Q. And as a result you negotiated, together with Mr. Paisley, with this gentleman, Mr. Vrooman, and you did make an agreement with him? A. Yes, sir."

We need not determine that the preceding answers to the questions, "He did," and "Yes, sir," instead of "He did not," and "No, sir," as the signed deposition establishes, constituted substantive evidence of the facts, for, notwithstanding, the evidence shows that plaintiff's services were voluntary, as they were not predicated on a contract in the first instance. In McKeon v. Tyler (Mass.), 149 N. E. 615, l. c. 616, the court say: "The information furnished by a broker, who is not employed by the seller, may be

availed of by him without making him liable to pay a commission. Taking advantage of the services performed by the broker, without some evidence to show an original employment or subsequent ratification, does not make the defendant liable.'' We have heretofore shown that an original contract of employment did not exist, and we need not elaborate it. [4 R. C. L. 298; 9 C. J. 554.] We see nothing of ratification in the evidence. In 4. Ruling Case Law, page 299, on the subject of ratification, it is said: ''To warrant the inference of a previous request, the owner must say or do something tending to prove that he accepted the broker as his agent in the matter—something more than merely selling to the party whom the broker, while acting as a volunteer, brought to him. Of course, the fact that a vendor accepts the benefits of a broker's efforts does not render him liable to the broker for commissions on the theory of ratification, where he did not know that the broker was working in his behalf.'' Quaere: Is it necessary to plead ratification?'' [Lipscomb v. Talbott, 243 Mo. 1, 147 S. W. 798.]

Moreover, the preceding questions and answers do not tend to show the existence of a contract of employment. It may be that plaintiff served defendant in introducing Vrooman to its treasurer; it may be that plaintiff brought Vrooman to defendant's notice, that he possessed property of a kind that interested defendant, and that as a result defendant negotiated and made an agreement with him, but, without a contract on which to predicate liability, the service rendered by plaintiff was voluntary.

III. Without the knowledge and consent of the owner whom he purports to represent, a real estate broker or agent is not permitted to represent both the vendor and the vendee. Plaintiff stated that he was agent or broker for the St. Regis Realty & Investment Company. He did not claim that he notified either of the parties to the transaction that he was assuming to act for both of them, nor did he state that he obtained their consent to such dual agency. When plaintiff approached defendant's treasurer, he appeared and assumed the attitude of a real estate agent, able, ready and willing to represent his customer, the owner of the Gay Building, until the completion of the trade. He did not appear in the role of broker merely introducing his customer from whom he expected commissions because of the introduction. The evidence denominates him a real estate broker representing a customer. If so, whether he gave it or not, his customer was entitled to unbiased advice and loyal efforts, and he could not thus represent his customer if he also represented the other party to the transaction, for his interest and loyalty would be divided. The role in which plaintiff appeared denied him the right to represent both parties to the transaction,

for it was against public policy. The facts show that plaintiff purported to act as a real estate broker or agent, and not as a mere middleman. Thus, he was not entitled to compensation. [Corder v. O'Neill, 207 Mo. 632, 106 S. W. 10; Atlee v. Fink, 75 Mo. 100.]

IV. Pursuant to our determination that plaintiff in any event is not entitled to recover, it is evident that his contention, that the judgment should have been for $87,500, *non obstante veredicto*, cannot be sustained. The judgment is reversed. *Henwood* and *Cooley, CC.*, concur.

PER CURIAM:—The foregoing opinion by DAVIS, C., is adopted as the opinion of the court. All of the judges concur.