CORNET & ZEIBIG, INC., a Corporation, Respondent,

v.

430 WITHERS REALTY CO., a Corporation, Appellant,

and

Missouri Pipe Fittings Company, a Corporation, Respondent.

No. 52564.

Supreme Court of Missouri, En Banc.

May 8, 1967.

Rehearing Denied June 12, 1967.

Mark D. Eagleton, Thomas F. Eagleton, J. J. Thyson, Daniel P. Reardon, St. Louis, for Missouri Pipe Fittings Co.

Cook, Murphy, Lance & Mayer, D. Jeff. Lance and Samuel B. Murphy, St. Louis, for respondent Cornet & Zeibig, Inc.

Edwin Grossman, John T. Murphy, Jr., St Louis, for Withers Realty Co.

DONNELLY, Judge.

In this court-tried suit, Cornet & Zeibig, Inc., a real estate broker (Broker) sued 430 Withers Realty Company (Seller) and Missouri Pipe Fittings Company (Buyer) for a commission in connection with the sale of real estate in the City of St. Louis. Seller cross-claimed against Buyer for such amount as Broker recovered against Seller, together with the cost of defending Broker's claim. At trial, Broker dismissed as to Buyer. Judgment in the trial court was for Broker on its petition and for Buyer on Seller's cross-claim.

■ Seller appealed to the St. Louis Court of Appeals where an opinion was written, concurred in by a majority of the Court, reversing the judgment of the trial court, holding for Seller against Broker, and that Seller is entitled to recover its costs of defense against Buyer. Ruddy, J., concurred in result as to the dispute between Broker and Seller, but dissented as to the dispute between Seller and Buyer, and certified the case to this Court. Seller contends that our review in these circumstances is limited to the issue causing the certification. We do not agree. The entire case will be determined here "the same as on original appeal." Rule 84.05(h), V.A. M.R.; Mo.Const., Art. V, § 10 (1945), V.A. M.S.; Combellick v. Rooks, Mo.Sup., 401 S.W.2d 460; State ex rel. Whittington v. Strahm, Mo.Sup., 374 S.W.2d 127.

The controversy involves Edmund F. Gorman and Irving Jack Hunstein (for Broker); Mortimer Ross, President, and Edwin M. Grossman, Attorney (for Seller); and Mark D. Eagleton, President; J. J. Thyson, Vice-President and Attorney; and Bill Roewe, Plant Manager (for Buyer).

In 1960, Seller decided to sell its factory building and adjoining lot. Ross posted a "For Sale" sign on the building and placed advertisements in the Wall Street Journal and St. Louis Post-Dispatch. Gorman saw the sign in the Fall of 1960, called Ross, learned the asking price was $192,500, and Ross informed him he would pay a six percent commission if Broker "produced or introduced" a buyer. Gorman and Hunstein inspected the building.

Later, in January, 1961, Hunstein saw the newspaper advertisement, and not connecting the advertisement with the property he had inspected, called Ross, inquired about the property, and asked Ross if he would pay a real estate commission. There is a dispute in the testimony here. Hunstein testified that Ross "said that he would," and that "if we produced a buyer he would pay a commission." Ross testified that he told Hunstein there was a commission on a sale price of $192,500 but that he did not promise to pay a commission on a sale price other than $192,500.

Over the previous two-year period, Hunstein had shown Buyer a number of buildings. After he talked with Ross, Hunstein called Roewe, and on or about January 18, 1961, arranged with Ross for Roewe to inspect the building. Roewe indicated an interest in the building, and Ross gave Hunstein a key to the building so that Roewe's associates could inspect the building. Within the next day or two, Hunstein took Eagleton and Roewe through the building. It then became necessary that Thyson view the building so Hunstein took the key to Thyson. During this period of time, Hunstein kept Ross informed. Within a week or ten days, Hunstein discussed the matter with Eagleton, and Buyer agreed to make an offer of $130,000. Eagleton gave Hunstein an "earnest money" check for $1,000, and Hunstein prepared a contract dated February 1, 1961, specifying a closing date of March 3, 1961. On February 2, 1961, Thyson signed the contract in behalf of Buyer, and Hunstein took the contract to Ross, who examined it. Ross informed him that $130,000 was not enough money and, after some discussion, agreed to take "$170,000 net" with Broker's commission to be "on top of this net figure." Hunstein reported back to Buyer that its offer had been rejected but that Ross would accept $180,000. Hunstein testified that he was informed that Buyer "would have to talk it over and think about it." Thyson testified that Hunstein called him on February 3, 1961, told him he had submitted the $130,000 offer to Ross and Ross had turned it down, and that Hunstein said, "I thought we had a chance but you never know owners, and he turned this down and it's final, the thing is dead, so I'm going on to something else and I'll send you back the contract." On February 6, 1961, Hunstein wrote a letter to Buyer in which he said, "I am sorry we were unable to make this deal but I felt all along that we had an outside chance." He returned the $1,000 check with the letter but did not return the contract.

Buyer, after receipt of Hunstein's letter of February 6, 1961, directed its attention to purchase of some land in Troy, Illinois, and encountered difficulties there. Buyer then entered into direct negotiations with Seller. Over a period of several days Buyer made an offer of $140,000, Seller turned it down, Buyer offered $150,000, Seller reduced to $165,000, and finally an agreement was reached at $157,500. On March 3, 1961, an earnest money contract was signed by Seller and Buyer. Buyer agreed therein to hold seller harmless from any claims of Broker, together with the cost of defense of same, and Seller covenanted that it had not entered into any agency contract with Broker.

In early March, 1961, Hunstein met Ross on the street, and "since I was trying to sell his building, I crossed over the street to talk to him briefly." Ross told Hunstein he had sold the building but did not tell Hunstein that Buyer had bought it. Later, Hunstein attempted to interest Buyer in the Medart Building and first learned from Buyer of its purchase of Seller's building. Broker then demanded a commission.

We review the case "upon both the law and the evidence as in suits of an equitable nature. The judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Supreme Court Rule 73.01(d), V.A.M.R.

Is Broker entitled to recover a commission from Seller under the facts in this particular case? The first question for determination is whether a binding contract of employment existed between Seller and Broker. Seller contends that the evidence shows at most an offer by Ross which never ripened into a binding, bilateral contract. Broker contends there was an implied contract of employment between Seller and Broker.

This Court in Windsor v. International Life Ins. Co., 325 Mo. 772, 781, 29 S.W.2d 1112, 1116, said: "Before an owner may become liable upon an implied contract, it is essential that the owner know, or has reasonable ground to believe, that the services of the broker are to be rendered with the expectation of receiving payment therefor. On this subject, in Atwater v. Lockwood, 39 Conn. 45, loc. cit. 49, the court say: 'Unless the defendant knew while the service was being rendered that the plaintiff was acting for him, or had such information on the subject as would cause a person of ordinary understanding under like circumstances to believe that he was so acting, no implication of employment can be made. A contract is the meeting of the minds of the contracting parties, and where there is no express contract, the party sought to be charged must have such knowledge, or what is equivalent thereto, before his mind can act on the subject, and assent to the terms of the contract.' Weinhouse v. Cronin, 68 Conn. 250, 36 A. 45. In Segnitz v. A. Grossenbach Co., 158 Wis. 511, loc. cit. 514, 149 N.W. 159, 160, the rule is stated thus: 'In order to raise an implied contract to pay for services, several things are necessary * * * First, the services must have been performed under such circumstances as to give the recipient thereof some reason to think they are not gratuitous, nor performed for some other person, but with the expectation of compensation from the recipient. * * * Second, in order to raise an implied contract to compensate for them, the services must have been beneficial to

the person sought to be made liable.' 43 A.L.R. 843."

■ The parties agree that Hunstein and Ross discussed the property and the payment of a commission. Hunstein contacted Buyer, showed the property to Buyer, induced Buyer to make an offer, and conveyed the offer to Ross. Ross knew of all this and knew Hunstein expected to be compensated for it. We cannot infer from the evidence that Ross expected Hunstein's services to be gratuitous. Hunstein's services were beneficial to Seller. The first contact between Seller and Buyer was made through Hunstein's efforts. We do not believe that under the evidence it can be said that Hunstein was Buyer's agent. There is no evidence that Hunstein expected compensation from Buyer for his efforts. We hold that a binding contract of employment existed between Seller and Broker. Windsor v. International Life Ins. Co., supra; Chamberlain v. Grisham, 360 Mo. 655, 230 S.W.2d 721.

■ Seller contends that Broker cannot recover because Ross did not promise to pay a commission on a sale price other than $192,500. We recognize the rule of law that "when the contract between the broker and his principal expressly makes the payment of commissions dependent on the obtaining of a certain price for the property the broker cannot recover, even though the owner sells at a lower price to a person to whom the broker has first shown the property, * * *." 46 A.L.R.2d 848, 859. However, this rule is not applicable here.

■ The parties agree that in January, 1961, Hunstein called Ross, inquired about the property, and asked Ross if he would pay a real estate commission. Hunstein testified that Ross "said that he would," and that "if we produced a buyer he would pay a commission." Ross testified that he told Hunstein he would pay a commission on a sale price of $192,500 but that he did not promise to pay a commission on a sale price other than $192,500. The trial court re-

solved this conflict in the testimony in favor of Hunstein and we cannot find his ruling to be clearly erroneous.

Seller contends that Broker cannot recover because Broker "abandoned the deal and as a result was not the procuring cause" of the sale. Seller cites in support of its contention Real Estate Enterprises, Inc. v. Collins, Mo.App., 256 S.W.2d 286. This case, and Young v. Stecher Cooperage Works, 259 Mo. 215, 168 S.W. 611, cited therein, are not in point. In those cases, the agencies were for *specified periods*, the sales were consummated long after the agencies had expired, and the courts properly found abandonment. Here the agency was for an unspecified period. Seller also cites Taylor v. Vestal, Mo.Sup., 304 S.W.2d 820, where this Court held for the seller and against the broker. The Taylor case is not in point. In that case, the broker did not make any effort to interview the buyer "or in any way pursue negotiations to the end of inducing her to purchase." 304 S.W.2d 820, 824.

Seller relies upon Hunstein's statement to Thyson, his letter of February 6, 1961, sent to Eagleton, his return of the earnest money to Buyer, and his return of the keys to Ross, all evidencing Hunstein's belief that "he couldn't make the deal." Seller also contends that Buyer's interest in the Troy, Illinois property constituted "a definite break in the continuity of the negotiations amounting to an abandonment of the deal." Real Estate Enterprises, Inc. v. Collins, supra.

■ We recognize the rule of law to the effect that although "the broker may be the means of first bringing the parties together and of opening negotiations with them, yet if the negotiations are unproductive and the parties in good faith withdraw therefrom and abandon the proposed purchase and sale, a subsequent renewal of negotiations followed by a sale at a lower price does not entitle the broker to commissions, as he cannot be said to be the procuring cause of the sale." 46 A.L.R.2d 848,

864, 865. However, in our opinion, there is not sufficient evidence of abandonment to preclude recovery by Broker in this case. It is undisputed that the property was originally placed in the hands of Broker for sale. Hunstein "found" Buyer for Seller, took Buyer's representatives through the building, and persuaded Buyer to make Seller an offer for the property, which offer, though rejected by Seller, was the first phase of serious negotiations for the sale of the property. This offer was conveyed to Ross on February 2, 1961. The sale was consummated on March 3, 1961. Hunstein's actions, taken in the belief "he couldn't make the deal," did nothing to hamper the consummation of the sale. The fact that Seller and Buyer did not see fit to include Hunstein in their direct negotiations cannot be allowed to legally prejudice Broker, particularly when these negotiations and the consummation of the sale were unknown to Hunstein.

In Tyler v. Parr, 52 Mo. 249, 251, this Court held that "if the agent introduces the purchaser, or discloses his name to the seller, and through such introduction or disclosure negotiations are begun, and the sale of the property is effected, the agent is entitled to his commissions though the sale may be made by the owner." In 46 A.L.R.2d 848, at 852, it is said: "The general proposition is well established that if property is placed in the hands of a broker for sale at a certain price, and a sale is brought about through the broker as a procuring cause, he is entitled to commissions on the sale even though the final negotiations are conducted through the owner, who, in order to make a sale, accepts a price less than that stipulated to the broker. The law will not allow the owner of property sold to reap the fruits of the broker's labor and then deny him his just reward." See also Bell v. Kaiser, 50 Mo. 150.

■ The essential question is whether Hunstein's efforts brought about the sale. This question is really answered by what has already been said. Broker's contract

was not that Hunstein should find one willing to buy on terms that Seller would find acceptable, *and* then attend to the negotiations and bring the parties safely through them to a consummated sale before being entitled to a commission. All he had to do was "produce a buyer," bring the parties together, and let them do the necessary negotiating. Hunstein did all of this and it cannot be said that his efforts were not a procuring cause of the sale. We hold that Broker is entitled to a commission of $9,450.

We finally consider whether Seller is entitled to recover from Buyer under the terms of the "hold harmless agreement" contained in the earnest money contract executed by Seller and Buyer on March 3, 1961. It reads as follows:

> "Purchaser agrees to indemnify and hold Seller and Mortimer Ross harmless from any and all claims of Cornet & Zeibig, Inc., and Jack Hunstein, or either of them, for a commission in connection with this sale, together with the cost of defense of same. Seller warrants that neither Seller nor Mortimer Ross entered into any agency contract with Cornet & Zeibig or Hunstein for the sale of the said property."

■ The question as to whether a contract existed between Seller and Broker has already been affirmatively answered. Was it an "agency contract" within the terms of the agreement? We believe that it was. In Wolfersberger v. Miller, 327 Mo. 1150, 1160, 39 S.W.2d 758, 762, this Court said: "It appears to be the general doctrine, in fact we have discovered no case to the contrary, that the relationship existing between a real estate broker and the vendor of real estate is that of agency, and that the principles governing their respective rights and liabilities are regulated by rules of law applicable to principal and agent. * * *"

Seller contends that the two sentences of the "hold harmless agreement" constituted independent covenants. Thyson, attorney for Buyer, testified in this regard as follows: "Q So you agreed to hold him harmless if he would warrant that he hadn't retained Cornet & Zeibig. That's about the substance of it, isn't it? A Well, I agreed to his first sentence if he'd take my second." Grossman, attorney for Seller, testified as follows: "I gather he did that and I had some more conversations by telephone—or in person, having met Mr. Thyson in the building on the way in or out, and this went on for some days and finally in one of our conversations—I guess during that interval —I probably drew this first sentence. I said this was what we wanted. I think during that period Mr. Thyson by that time had drawn the second sentence because he said, 'You want us to hold you harmless from liability to Hunstein and Cornet & Zeibig because he came in with us, but we don't know what you've been doing, for all we know maybe you had some arrangement with Hunstein.' I said, 'no, we had no arrangement with Hunstein. We didn't know him. We'll be perfectly happy to give you the second sentence because we don't know Mr. Hunstein.'

"At that time Mr. Ross did not remember any conversation with Mr. Hunstein that has been testified to here and that is why they knew they hadn't any liability to them and we didn't know of any liability. That is the background of the clause that went in."

■ We find Seller's contention to be without merit. The two sentences are mutually dependent. Seller is not entitled to recover against Buyer.

The judgment of the trial court is affirmed.

All concur.